STATE, Plaintiff, v. McNAMARA, Defendant.

*No. State 40. Argued May 8, 1975.—Decided June 3, 1975.*
(Also reported in 229 N. W. 2d 698.)

For the plaintiff in error there was a brief and oral argument by *James A. Drill* of New Richmond.

For the defendant in error there was a brief and oral argument by *Carroll B. Callahan* of Columbus.

PER CURIAM. Daniel R. McNamara is fifty-two years of age, a resident of Montello, Wisconsin, and has practiced law in Montello and the surrounding communities since 1954. He graduated from the University of Wisconsin Law School in 1948, and was admitted to practice law in Wisconsin in that year. He is married and the father of four children, ranging in age from twenty-two to twelve years.

Prior to the defendant's attendance at law school, he served in the Army Air Corps for four years and was honorably discharged as a captain, in 1946.

While attending law school, he ran an automobile dealership in Portage, Wisconsin, which he continued to operate until 1950. Throughout his legal career, the

defendant has continued to participate in the buying and selling of automobiles. Some of the charges raised in this proceeding concern activities of the defendant while participating as a principal in the Viking Auto Corporation of Baraboo, Wisconsin, together with Gene Casey, who, at the time of the hearing, was serving a jail sentence for his Viking activities.

In 1956, the defendant served briefly as the city attorney for Montello. He was elected, unopposed, city attorney again in 1974, while serving a jail sentence for the misdemeanor convictions related in Count I. McNamara had also served as the Marquette county district attorney in 1973. He was appointed to the position following the death of his law partner, who was serving in that capacity. Shortly thereafter the appointment was revoked due to the investigation leading to the misdemeanor convictions and the present complaint.

Although defendant does not seek review of the findings of the referee with regard to the charges, this court has held that it must look at the record de novo to determine whether the facts warrant discipline or suspension. *State v. Heilprin* (1973), 59 Wis. 2d 312, 321, 207 N. W. 2d 878. The character of the alleged misconduct of the defendant can appropriately be described by reviewing each count, the significant evidence thereon, and the findings of the referee.

## Count I.

This count alleges on information and belief that the defendant was convicted in 1974 of six violations of the Wisconsin statutes, including: Fraudulent application for registration of a motor vehicle; improper use of evidence of registration; theft; and three counts of failing to register an aircraft. All of the convictions are for misdemeanors and all pursuant to a negotiated plea of guilty.

The allegations of Count I were admitted by the defendant in his answer. The defendant asserts that his willingness to admit these allegations as well as the fact that he independently informed the bar association that the charges were pending prior to his plea, shows his desire and willingness to cooperate with the bar in its investigation of his alleged improper conduct.

While some cooperation is evidenced thereby, it is not persuasive and the record does not disclose the full facts that resulted in the negotiated plea. The plea was entered pursuant to a plea arrangement between the defendant and the department of justice. The record reflects that it is common knowledge that the department of justice reports such convictions to the Board of State Bar Commissioners immediately following the entry of a plea.

The defendant was sentenced to a six month's concurrent sentence of each charge and fined $1,000. The sentences have now been served and the fine paid.

## Count II.

This count alleges that on January 17, 1970, defendant furnished a false financial statement to the First National Bank of Wisconsin Rapids for the purpose of obtaining a $20,000 line of credit for Viking Auto. While this was denied by the defendant in his answer, the evidence conclusively shows that the financial statement falsely asserted that the defendant had an interest in various parcels of real estate and that he had life insurance with a cash value in excess of $6,000.

The defendant, after repeated denials and vague and evasive responses, admitted that all of the property listed on the financing statement as being both in his name and the name of his wife, was solely in the name of his wife and that he had no interest therein. He also admitted that at the time the financing statement was

executed, it was "error" to have listed the amount of cash value life insurance owned as contained in the statement.

The complaint alleges, and the testimony supports a finding, that the defendant's status as a lawyer was relied upon in extending the credit. The financing statement listed the defendant's occupation as an attorney. It was undisputed that each written communication which the defendant had with the bank was made on the defendant's letterhead stationery, clearly identifying him as an attorney. Darwin Blanke, president of the bank, testified that he was informed that the defendant was an attorney when the credit was applied for and that fact favorably influenced his decision to extend credit although he could not speak for the rest of the governing board of the bank. It was undisputed that the defendant's partner in Viking Auto, Gene Casey, was then indebted to the bank for $20,000. One year later, on January 14, 1971, the bank asked for and obtained a guarantee from the defendant covering loans to Viking Auto Corporation up to $20,000.

A review of the record with regard to this transaction supports the findings of the referee that the actions of the defendant in obtaining this credit were unprofessional. Moreover, the record does not support the defendant's contention that he freely admitted his wrongdoing to the bar commissioners and the referee. The defendant's testimony is replete with evasive answers and convenient lapses of memory. A denial of the falsity of the statement on direct examination is followed by admissions as to parts thereof which were false upon vigorous cross-examination. The defendant's contention that only negligence is involved here, and not a deliberate attempt to falsify, is not persuasive in view of the obviousness of the errors to one trained in law.

The conduct in question shows the interrelationship between the defendant's private transactions and his

status as a lawyer. The defendant's profession had a favorable impact on the bank's dealings with Viking Auto and the defendant did little to discourage such reliance by communicating with the bank on his professional letterhead stationery. Under such circumstances the defendant cannot meritoriously contend that his improprieties were unrelated to his status and standing as a lawyer.

### Count III.

This count involves the sale of a 1968 Buick to one Laura Moore on August 30, 1971. The evidence conclusively establishes that title to the car was being held by the First National Bank of Wisconsin Rapids which had a lien on the car at the time of the sale. Despite this, defendant sold the car, representing that it was free of liens and encumbrances and assisted Laura Moore in obtaining financing for the car at the Farmers and Merchants National Bank of Princeton. Laura Moore never obtained the title to the car, and ultimately sold it.

The defendant's testimony concerning this transaction was characterized by the referee as "evasive" and "uncooperative," and the evidence supports this finding. Defendant initially told the bar commissioners that he presented the title to Laura Moore for her signature at the time of sale and then turned it over to Viking Auto and his partner, Casey, for recording. At the referee's hearing, he admitted that he knew there was a previous encumbrance on the car but testified that he expected Viking Auto would pay it after the sale. He then admitted, however, that he deposited the proceeds of the sale in his private account and that he did not pay the prior lien. Finally, the defendant admitted that the title to the car had been at the First National Bank

of Wisconsin Rapids during the whole transaction and is still there, although he professed not to have discovered this until after he testified before the bar commissioners.

The defendant was made aware of the fact that Laura Moore had not received the title to the car because she complained to him about it after the sale. Rather than check for the whereabouts of the title, defendant obtained a renewal on Laura Moore's registration and plates for her old car so she could use it to continue driving the Buick. When the Buick was subsequently traded in, Laura Moore again called the defendant with regard to the title. The defendant informed the purchaser, George Snow, to go ahead with the deal, that he would supply the title. While there was no direct proof of the defendant's involvement received at the hearing, a duplicate title was subsequently obtained for the car despite the fact that the original title was still in the possession of the bank. It was this title which served as the basis for one of the misdemeanor convictions referred to in Count I.

The pattern of excuses relied upon here, that the defendant thought someone else was going to pay an obligation for which he held the money, repeats itself in the testimony with regard to Count VI. So too, there is a recurring pattern of obtaining double encumbrances upon cars by one device or another, as evidenced by Count IV. These similarities take much of the thrust out of the defendant's contention that he was innocent of any knowing wrong or that he was only negligent with regard to the handling of automobile transactions.

### Count IV.

This count alleges that the defendant forged the signature of John F. Geer, a vice-president of the Farmers

and Merchants National Bank of Princeton, on a certificate of title covering a 1966 Chevrolet Corvette in such a fashion as to indicate the release of a lien on the car held by that bank. It is also alleged that the certificate was thereafter delivered to the First National Bank of Wisconsin Rapids and used as security to obtain an additional loan on the car in the amount of $1,600.

The defendant repeatedly denied forging the signature. Although he did not deny that he was in the First National Bank on January 14, 1971, the day it was alleged that he delivered the certificate to that bank for the extension of credit, he did deny that the Corvette loan was discussed on that date. He further denied any knowledge of the First National Bank loan until some time after it was granted.

The state introduced the testimony of Jerry D. Kelly, an expert document examiner employed by the Wisconsin state crime laboratory, who stated without qualification that the defendant had forged the signature. When questioned by counsel for the defense whether some other document examiner might possibly reach a different conclusion, Mr. Kelly responded:

"On the basis of the number of characteristics in common, I could not believe that any competent examiner would disagree."

Despite the fact that the document in question was made available to the defense for examination by its own expert, no other expert opinion was offered at the hearing.

Darwin Blanke, president of the First National Bank, testified that on January 14, 1971, the defendant and Casey were both present when the subject certificate was presented and the loan extended. He could not state, however, whether the document was handed to him by the defendant or Casey.

The referee was satisfied that the defendant had committed a forgery and our examination of the record does not supply any rational basis for any other conclusion. This act constituted gross unprofessional conduct involving moral turpitude.

### Count V.

This count alleges that from 1971 through 1973, the defendant maintained an attorney's trust account at the Farmers and Merchants National Bank at Princeton, which was used for the deposit of personal funds, auto sales' funds, and clients' funds, as well as for the payment of personal expenses and auto sales' expenses.

The defendant admitted these allegations with the exception that he contended that no client funds were ever deposited in the account. The defendant did admit that he deposited funds owned to the Zurich Insurance Company from a settlement arranged by the defendant, but contended that Zurich was not his client.

It appears from the record that Zurich was not technically the defendant's client but rather was a participant in a settlement arranged on behalf of Mr. Trimble, who was a client of the defendant.

Reid Mevis, president of the Farmers and Merchants National Bank of Princeton, testified that the defendant's misuse of the client trust account was frequently called to the defendant's attention but that the defendant continued to use the account for improper purposes. Mevis also testified that they had found it necessary to close the trust account because of the way it was being handled including the fact that it was frequently overdrawn.

This commingling of funds takes on greater significance when considered together with the allegations of Count VI, hereinafter discussed. The significance of

the commingling taken alone, is that it again shows the interrelationship between the defendant's activities as a lawyer and those as an automobile broker. The defendant did not choose to maintain even a limited bookkeeping or financial separation amongst his affairs, and his argument now, that this court should view his improprieties as being limited to his automobile selling activities and unrelated to and not affecting his competency and abilities as a lawyer, is particularly unpersuasive.

### Count VI.

This count alleges that the defendant misappropriated $3,861.27 belonging to the Zurich Insurance Company as the result of the settlement set forth above.

Admissions and stipulations, eventually made by the defendant at the hearing, establish the following events: On September 1, 1972, there was an insurance settlement involving the defendant's client, Mr. Trimble, versus the Employers Mutual Insurance Company of Wausau in the total amount of $21,272.46; that the check was cashed at the bank in Princeton and Mr. Trimble was paid his amount of $13,411.19; that out of the remainder the defendant deposited in the account of his partner, Mr. Mangan, now deceased, $1,500, in the trust account of McNamara and Mangan the amount of $1,000, and in defendant's own trust account the sum of $5,361.27, $3,861.27 of which belonged to Zurich under the settlement.

Rosalie H. Wielgosh, an employee at the Princeton Bank, who had examined the defendant's trust account records, testified that the deposit of the Zurich funds was made on September 5, 1972. She stated that on September 6, 1972, the defendant withdrew $3,189.57—the exact amount of a loan payment made by the defendant on that day against an outstanding loan at the

same bank. This withdrawal left a balance in the trust account of only $1,186.40, an amount insufficient to pay the money owed to Zurich. Wielgosh further testified that the defendant's trust account never again had a balance in excess of $1,186.40.

Mr. Mevis and Mrs. Wielgosh testified, and the defendant admitted, that the money owed to Zurich, was eventually paid in August, 1973, almost one year after it was due. The money to pay this amount came from a loan made by the bank to the defendant's mother, Margaret McNamara, in July, 1973.

The defendant initially testified before the bar commissioners that he had handed the whole matter over to his law partner, Mr. Mangan, who was to close the deal after the settlement was reached. The defendant told the commissioners that he did not discover that his partner had not paid Zurich until after his partner's death in June, 1973, at which time he searched the file and found a bank money order payable to the insurance company. At the hearing before the referee, however, the defendant admitted that he had handled the whole settlement and that all that was left for Mangan to do was issue the check to Zurich. The defendant then admitted that he was wrong when he said that a money order was found in the file after his partner's death. The defendant then stated that he expected Mangan to make the payment, but admitted that the funds were placed in his own personal account and never given to Mangan.

James N. Molloy was called by the state as the person who handled the claim for the Zurich Insurance Company. He testified that he called the defendant numerous times with regard to the payment due Zurich. He stated that he could only reach the defendant on one occasion, in September or October, 1972, and was told by the defendant that the check had just been sent. Molloy

also stated that he sent registered letters to the defendant demanding payment which were returned marked "Refused." This could not be verified as the Zurich records were in storage in Chicago at the time of the hearing. The defendant denied ever having a conversation with Molloy or receiving the letters in question.

It was undisputed that Zurich filed a complaint with the grievance committee of the local bar and did not obtain payment from the defendant until after that grievance was filed.

A complete review of the record regarding this incident leaves little doubt that the defendant was not telling the complete truth and was evasive and unresponsive. The referee's comment at the close of his report is fully justified by the record:

". . . His [defendant's] inconsistent testimony at the hearing indicates that he deliberately lied to the Board of State Bar Commissioners and to your referee."

The incident alleged and proven under this count casts serious doubts on the defendant's fitness for the continued practice of law. Setting aside the probability that the defendant lied about his activities and attempted to shift the blame for the nonpayment to his deceased law partner, the incident itself shows an intentional misappropriation of funds which the defendant held in trust for Zurich. Zurich was forced to hire a lawyer to recover the money undeniably owed to it and McNamara had the use of it for nearly a year.

The rationalization which the defendant offered for his conduct for this count fit precisely the pattern of excuse offered in the Moore automobile transaction (Count III). There too, the defendant contended the money was to be paid by one of his partners, in that instance, Casey. Despite this assertion, in both in-

stances the defendant deposited the money intended to pay the amount due into his own account. Defendant's contention that he was only negligent in his affairs, and the implication that he was the innocent victim of the misdeeds of his partners, is totally unsupported by the record.

We have considered the testimony of the various character witnesses who testified in his behalf, together with the supportive testimony of several lawyers in the area who had known the defendant for many years and also engaged in professional transactions with him. These testimonials as to the defendant's character go to the extent and nature of the discipline and not to the question of whether discipline is needed for the protection of society. *State v. Postorino* (1972), 53 Wis. 2d 412, 419, 193 N. W. 2d 1.

The license to practice law in this state is granted upon an implied understanding that a lawyer shall at all times demean himself in the proper manner and refrain from such practices which bring disrepute upon himself, the profession and the courts. *State v. Eisenberg* (1970), 48 Wis. 2d 364, 380, 381, 180 N. W. 2d 529, certiorari denied, 402 U. S. 987, 91 Sup. Ct. 1669, 29 L. Ed. 2d 153, rehearing denied, 403 U. S. 940, 91 Sup. Ct. 2250, 29 L. Ed. 2d 721. Bar discipline is imposed, not to punish the individual, but for the fundamental purpose of protecting the public interest so that there may be assurance of the moral fitness and professional responsibility of everyone licensed to practice law in this state. *State v. Kondos* (1974), 66 Wis. 2d 119, 123, 224 N. W. 2d 211; *State v. Schoendorf* (1973), 60 Wis. 2d 309, 310, 210 N. W. 2d 447; *State v. Krumme* (1969), 41 Wis. 2d 775, 781, 165 N. W. 2d 148.

In *State v. McCarthy* (1949), 255 Wis. 234, 250, 38 N. W. 2d 679, a morally turpitudinous act, among other things, was said to be " 'anything done contrary to justice, honesty, principle or good morals. . . .' "

Each of the six counts alleged in the complaint have been proved by clear and satisfactory evidence. *State v. Postorino, supra.* They include transacting his automobile business and personal business by commingling of funds in his lawyer-trust account; automobile financing transactions involving the use of his law office stationery; forgery to secure a lien satisfaction in an automobile transaction; misappropriation of funds; convictions of theft and fraudulent application for registration of a motor vehicle; and untruthful and evasive testimony both before the State Bar Commissioners and the referee. There is undeniable proof in the record that the defendant was not truthful with regard to the Zurich incident (Count VI). There was an evident attempt by the defendant to lay the blame for some of the charges on his business partner, Casey, who was in prison, and his now deceased legal partner, Mangan. His testimony frequently showed a lack of honesty and candor. Many of these charges involve moral turpitude and grossly unprofessional conduct. The fact that most of them do not involve the attorney-client relationship in the strict sense is of no consequence. In *State v. Preston* (1968), 38 Wis. 2d 582, 588b, 157 N. W. 2d 615, 159 N. W. 2d 684, certiorari denied, 393 U. S. 981, 89 Sup. Ct. 452, 21 L. Ed. 2d 442, it was stated:

"The responsibilities of a lawyer are well stated by Mr. Justice OWEN in *In re Stolen* (1927), 193 Wis. 602, 613, 214 N. W. 379, 216 N. W. 127:

" '. . . One's morality or lack of morality is revealed by general conduct. One may lack morality in a great many ways. Where this lack of morality has no relation to, and does not affect, his duties and responsibilities as an attorney at law, the delinquencies are generally overlooked by the courts. But where there is lacking honesty, probity, integrity, and fidelity to trusts reposed in him, it matters not whether the lack of such virtues is revealed in transactions with clients, in the conduct

of lawsuits, or any other business dealings or relations. These qualities are highly essential on the part of those who are to exercise the privileges and responsibilities of members of the bar. When the lack of them becomes apparent, no matter what the character of the deal or transaction that may furnish the evidence, it becomes the duty of the court to purge its roster of an unreliable member. . . .' "

A lawyer is a professional man twenty-four hours a day, not eight hours, five days a week. *State v. Postorino, supra,* page 419. In the minds of the public his professional status as a lawyer places him in a position of trust at all times and much is expected of him.

Daniel R. McNamara is guilty of unprofessional conduct; and

It is ordered and adjudged that the license granted to Daniel R. McNamara to practice law in this state is hereby revoked and annulled for due cause and his name removed from the roll of lawyers of this court; that the State Bar of Wisconsin notify the courts of record of this state of this order by sending each a copy thereof; that he notify his clients now represented by him in all matters involving the practice of law, or all matters pending in any court of this state, that his license to practice law in this state has been revoked.

It is further ordered that Daniel R. McNamara pay the costs and expenses of these proceedings, excluding any of the fees of the counsel for the State Board of Bar Commissioners, not exceeding the sum of $1,000.