STATE, Plaintiff, v. LEDVINA, Defendant.

*No. State 196 (1974). Argued January 5, 1976.—
Decided February 3, 1976.*
(Also reported in 237 N. W. 2d 683.)

For the plaintiff there was a brief and oral argument by *Robert H. Bichler* of Racine, counsel for board of state bar commissioners.

For the defendant there was a brief by *John H. Bowers, George E. Aumock, Robert J. Arnot* and *Lawton & Cates*, all of Madison, and oral argument by *George E. Aumock.*

PER CURIAM. In these bar discipline proceedings, the essential facts as to the professional misconduct are largely undisputed and were even stipulated to by both

the bar commissioners and the defendant, Martial Ledvina. The referee, Mr. Justice JOHN A. FIORENZA, filed findings to this effect and, in addition, entered findings, based on the testimony of the sole witness, Dr. Leigh Roberts, as follows:

"7. That at the time of the incidents referred to in the complaint the defendant was under a great deal of tension and mental strain which resulted in a depressed state of mind sufficiently marked that he could not sleep or eat; that this mental condition impaired his judgment and was a substantial factor and a proximate cause of his acting and conducting himself in the manner stated in the complaint.

"8. That the defendant still suffers from a mental disorder as of the date of the hearing.

"9. That the mental disorder which the defendant suffers from is not permanent in nature and can be medically treated.

"10. That the defendant is still under the care and treatment of a psychiatrist."

The referee recommended that the defendant's license to practice law be suspended for an indefinite period of time, pending recovery from this mental disorder. He further recommended that the defendant be allowed to petition for reinstatement when cured and that this court then appoint an independent psychiatrist to evaluate the defendant's mental condition.

Thus, the issues before us are:

1. Whether the stipulated misconduct constitutes professional misconduct; and

2. Whether the defendant is now cured of his mental disorder.

There can be no doubt that the defendant's misconduct, as found, was unprofessional and in violation of the defendant attorney's responsibilities in many respects.

Martial Ledvina, now aged forty-six, has been licensed to practice law in Wisconsin since June 21, 1957. He

resides and practices in Manitowoc county, Wisconsin. Between 1971 and 1973 he served as attorney for the Village of Mishicot, Wisconsin, and during this time became embroiled in a lengthy controversy with one J. B., the village police officer. J. B. had been hired in 1971 and was discharged from his position in February of 1972 by a majority vote of the village board.

The agreed-to facts reveal the extent to which Ledvina was involved in this controversy with J. B. The details demonstrate beyond any question that his involvement constitutes unprofessional conduct in many respects:

(1) After J. B.'s dismissal, and at a time when he knew that J. B. was represented by counsel, Ledvina sent several letters directly to J. B. Some of these letters related to legal matters upon which J. B. was represented by counsel, and others did not. The tone of many of these letters was cruel and vicious. For example, in a letter dated August 9, 1972, Ledvina, after issuing an ultimatum to J. B. regarding a small bill he owed, enclosed a newspaper clipping which pictured the plight of a man unable to pay his bills. In a September 16, 1972, letter, Ledvina enclosed a cartoon and suggested that J. B., who was then unemployed and on welfare, show it to his wife. The cartoon showed an unemployed worker, with a can of beer in his hand, sitting in front of a TV and arguing with his son.

(2) Ledvina solicited from J. B.'s creditors permission to pursue collection of their accounts, and when this permission was granted, he vigorously pursued collection of these accounts. He instituted legal action to recover these debts at least three times. One of these actions was a suit against J. B. to recover the sum of $1.17.

(3) In September of 1972, J. B. filed a civil rights suit in federal court against the village, the village board members, individually and as public officials, and Ledvina, individually and as attorney for the village. In spite

of the fact that he was a named defendant, Ledvina acted as attorney for the village board and five of the seven village board members. He also asked the other two board members to allow him to represent them as well, and he told them that, if he did not represent them, they would have to retain and pay their own counsel.

(4) While campaigning prior to the 1972 election for village board members, Ledvina was on one occasion a passenger in an automobile driven by one R. P. When one D. P. positioned himself in front of the car with a camera, Ledvina urged the driver to run him over. After the car went forward and D. P. moved out of its path and to the rear of the car, Ledvina urged the driver to back up. The car then moved backwards, and D. P. again moved out of its path.

The bar commissioners' complaint here alleged that Ledvina examined and rendered his opinion on the legal sufficiency of several candidates' nomination papers in a local election contest. It was alleged that these candidates were known supporters of J. B. The referee found that these allegations were not proved and thus they form no part of our consideration here. The complaint also alleged Ledvina threatened to sue an individual because of a complaint about Ledvina to the state bar. This charge was likewise found to be unsupported by the referee and thus is not considered here as part of these disciplinary proceedings.

Further facts showing unprofessional conduct were found, as follows:

(5) In August, 1973, Ledvina was required to appear before the Board of State Bar Commissioners to answer for his conduct. He assured the board that he would terminate his harassing behavior, and was admonished by the board for his past conduct. However, in October of 1973, he obtained copies of the 1934 marriage certificate of a couple who supported J. B. and copies of the birth certificate of their firstborn child. The certificates

indicated that the child was born less than nine months after the marriage. Ledvina caused copies of these certificates to be mailed to various persons. In November and December of 1973 he repeated this same course of conduct in regard to the 1951 marriage and birth certificates of another couple who supported J. B.

At the hearing, Doctor Leigh Roberts testified regarding Ledvina's conduct. His analysis and explanation were based upon three interviews with Ledvina, conducted between May of 1974 and April of 1975, with a total interview time of between three and four hours. He testified that, when he saw Ledvina the first time, Ledvina was tense and depressed. This state of mind was affecting his ability to eat and sleep. He found Ledvina to be "a compulsive personality with some paranoid trends." This mental condition became especially aggravated during the controversy with J. B. It impaired Ledvina's judgment and caused self-righteous, vengeful conduct. Dr. Roberts acknowledged that Ledvina was not psychotic or delusional. He could control his conduct, and the only effect of his mental condition was to impair his judgment. In the opinion of Dr. Roberts, Ledvina was "substantially improved" at the time of the last interview. He had been seeing a local psychiatrist fairly regularly, and his treatment consisted of therapy and medication. Dr. Roberts was of the opinion that Ledvina's illness was still present but was now being controlled by treatment. On one occasion Ledvina had unilaterally terminated his treatment and subsequently been involved in an episode characterized by the same type of anger and over-reaction as the prior incidents. For this reason Dr. Roberts thought that Ledvina's treatment should continue and should not end until the treating physician determined that Ledvina was cured. Dr. Roberts also thought that Ledvina now has "an excellent capability of functioning effectively as an attorney," since his illness was presently being controlled by treat-

ment, and that, purely from a psychological standpoint, it would be better if Ledvina were allowed to continue practicing law.

The defendant claims that the course of conduct, although admitted, does not constitute unprofessional conduct in violation either of his attorney's oath as set forth in sec. 256.29 (1), Stats., or of the rules of conduct set forth in sec. 256.29 (2), and in the American Bar Association Code of Professional Responsibility as adopted by this court on December 16, 1969.[1] We conclude, however, that Attorney Ledvina violated several provisions of his oath and several disciplinary rules.

First of all, in regard to the first incident, Ledvina's letters to J. B. violated DR 7–104(A) (1), which provides that a lawyer shall not, during the course of his representation of a client, communicate on the subject of that representation with a party he knows to be represented by a lawyer in the matter. More importantly, the cruel and vicious nature of these communications was a flagrant violation of DR 7–102 (A) (1), which enjoins a lawyer from taking action on behalf of a client when it is obvious that such action would serve merely to harass or maliciously injure another.

As for the second incident, Ledvina's solicitation of legal employment from J. B.'s creditors was a clear violation of DR 2–103 (A), and his attorney's oath, which forbids stirring up strife and litigation, and hunting up causes of action in order to be employed to bring suit. Furthermore, the motive for this solicitation and for the subsequent prosecution of petty suits against J. B. could only have been to embarrass and injure J. B., again in violation of DR 7–102 (A) (1). These actions were an unconscionable abuse of the power to bring suit which our society vests in attorneys. To violate society's trust solely in order to harm and embarrass a personal enemy is completely indefensible.

---

[1] 43 Wis. 2d ix–lxxvi.

Flagrant violations of the disciplinary rules also occurred in Ledvina's representation of the village and the village board members in the federal suit brought by J. B. Ledvina was a named defendant in this suit, and from the complaint it was obvious that he had allegedly played a major role in the discharge which was the subject of the suit. Under these circumstances, Ledvina's active representation of the village and five of the seven board members was a violation of DR 5-102 which provides that a lawyer should not accept employment in litigation if it is obvious that he ought to be called as a witness in that litigation.

In addition, there was a potential conflict of interest in Ledvina's representation of the village and the individual board members, and so a violation of DR 5-101, which prohibits a lawyer from accepting employment if his representation may be affected by his own financial or personal interests. The conflict was that both the village and the individual board members might have defended against the civil rights suit and perhaps even cross-complained against Ledvina as another named defendant by asserting that he had not given good-faith counsel regarding the legality of J. B.'s discharge but was motivated by a personal animus against J. B. Similarly objectionable was Ledvina's heavy-handed request to represent the other two board members who had voted against J. B.'s discharge. Again this was a suit in which it was apparent that Ledvina would have been a witness. In addition, these two board members might have taken a position diametrically opposed to that of the other five members who had voted to discharge J. B., and so it would have been a violation of DR 5-105 (A) to represent these two sets of clients.

Finally, in regard to all three of these incidents, Ledvina was at the time suffering from the mental condition described in detail by Dr. Roberts. This condition clouded his judgment and destroyed his professional objectivity.

Under these circumstances, Ledvina should have withdrawn from all representation that in any way related to J. B. because, as set forth in DR 2–110 (B), it was obvious that his obsessive mental condition rendered it impossible for him to carry out his employment fairly and effectively.

In the fourth incident, Ledvina urged another to attempt personal injury upon a person apparently supporting candidates opposed to his position. This incident does not relate to any activity in a professional capacity as do the prior incidents. However, this court has recognized that a lawyer is a professional person twenty-four hours a day, and not just eight hours a day, five days a week.[2] The court has also pointed out that a lawyer should demean himself in a proper manner and refrain from practices which bring disrepute upon himself and his profession.[3] Moreover, this incident was closely linked to the prior incidents of unprofessional conduct, in that all of these incidents arose out of the vitriolic dispute between Ledvina and his supporters and J. B. and his supporters. Under these circumstances, it is appropriate to consider this incident, not as an independent cause for discipline, but as a situation which casts light upon the nature and extent of the discipline called for by the other incidents of unprofessional conduct and as an indication of the defendant's moral fitness to continue the practice of law. While the facts surrounding this incident are very sketchy, it is apparent that Ledvina's response to the presence of his opponent was grossly and wantonly reckless, and this must be weighed in the balance in determining the appropriate discipline for his other acts of unprofessional conduct.

---

[2] *State v. McNamara* (1975), 68 Wis. 2d 701, 715, 229 N. W. 2d 698; *State v. Postorino* (1972), 53 Wis. 2d 412, 419, 193 N. W. 2d 1.

[3] *State v. McNamara, supra,* footnote 2, at page 713.

The final incident concerns Ledvina's mailings of marriage and birth certificates in order to embarrass supporters of J. B. after he had promised the Board of State Bar Commissioners that he would cease such harassment. Counsel for Ledvina did not contest the facts of this incident but demurred on the ground that such facts did not constitute unprofessional conduct. While it is true that these actions do not involve an attorney-client relationship, they were nevertheless a clear breach of the promise made by Ledvina to the Board of State Bar Commissioners. Ledvina had appeared before the board in his professional capacity on August 17, 1973, to answer charges of misconduct and had promised to discontinue his harassment of J. B. and his supporters. Two months later, he began to break that promise by a series of inexcusable mailings designed to embarrass J. B.'s supporters. In addition, these actions are morally reprehensible and cast doubt upon Ledvina's moral fitness to practice law. Thus the evidence of this incident goes, not to the question of whether any discipline should be imposed, but rather to the nature and extent of discipline required for the related incidents of unprofessional conduct.

In many of these incidents we are also of the opinion that Ledvina violated that provision of his attorney's oath in which he swore to "abstain from all offensive personality."[4] The mailing of insulting letters and cartoons to J. B., the urging of personal injury to D. P. during an election campaign, and the circulation of the embarrassing marriage and birth certificates of J. B.'s supporters were all displays of offensive personality, and violations of Ledvina's solemnly sworn oath.

The referee found that Ledvina's conduct was caused by the personality disorder described by Dr. Roberts. As

[4] Sec. 256.29 (1), Stats.

was made clear in *State v. Heilprin,*[5] such a disorder is not a defense to the defendant's professional misconduct and is not cause for medical suspension under sec. 256.286, Stats. In that case also, the defendant attorney was diagnosed as a compulsive personality, and he had engaged in a course of hostile and aggressive behavior. This court decided that a personality disorder really amounted only to a composite of personality traits which caused an individual difficulties in interactions with others, and that, if this court were to recognize such a disorder as a defense to a disciplinary proceeding, every attorney who acted in an obnoxious and unprofessional manner could absolve himself of responsibility by relying upon his disordered personality traits as the source of his trouble. A personality disorder, as in this case, is to be distinguished from a psychosis or other serious mental illness where an individual attorney is unable to perceive reality and where he exists in a world of fantasy and delusion. *State v. Cadden*[6] is such a case of mental illness. There was undisputed testimony here, however, from Dr. Roberts that Ledvina was not psychotic or delusional and that he could control his behavior at all times. Thus we have an attorney responsible for his acts who, according to the clear, satisfactory, and convincing evidence in the record, engaged in a vicious campaign of hatred and harassment over an extended period of time, during which he repeatedly violated several disciplinary rules and his attorney's oath. Such a course of conduct merits the indefinite suspension recommended by the referee. This court must protect the public from exposure to such injurious actions by members of the legal profession.

Counsel for Ledvina argue that the fact that he is now under psychiatric care and that his illness is now controlled by treatment shows that his rehabilitation is

---

[5] (1973), 59 Wis. 2d 312, 321, 322, 207 N. W. 2d 878.

[6] (1972), 56 Wis. 2d 320, 201 N. W. 2d 773.

nearly complete and that the public is no longer in need of protection. On the contrary, it must be concluded that there is clear, satisfactory, and convincing evidence that Ledvina is still liable to engage in vengeful and harassing behavior. Dr. Roberts testified that Ledvina had actually had a flare-up similar to his past behavior when he unilaterally terminated his treatment. While the likelihood of another such flare-up has probably been reduced, there is absolutely no assurance that Ledvina will choose to continue his treatment. Dr. Roberts also testified that in a case like Ledvina's, where there had been "substantial manifestations of illness," he would recommend a period of treatment, terminated in the discretion of the treating physician, followed by an observation period during which it could be determined if Ledvina was cured. Under these circumstances, the recommendation of the referee that Ledvina be suspended indefinitely pending his recovery from his mental disorder is the only appropriate means of protecting the public from the threat of future outbursts.

It is ordered and adjudged that the license of Martial H. Ledvina to practice law be and is hereby suspended until such time as, by order of this court, he is found to have recovered from his personality disorder; defendant may petition this court for reinstatement of his license to practice law at such time he is convinced his personality disorder has been removed; if defendant does so petition this court for reinstatement, this court will appoint an independent psychiatrist to evaluate the defendant's condition.

It is further ordered that Martial Ledvina pay the costs of these proceedings in the amount of $1,500, said costs to be paid prior to application for reinstatement.