**In the Matter of the Application for the DISCIPLINE OF Geoffrey PETERS, an Attorney at Law of the State of Minnesota.**

No. C2–86–1468.

Supreme Court of Minnesota.

Aug. 26, 1988.
As Amended Oct. 19, 1988.

Keith E. Roberts, Sr., Wheaton, Ill., for appellant.

William J. Wernz, Director, Betty M. Shaw, Asst., Office of Lawyers Professional Responsibility, St. Paul, for respondent.

Heard by YETKA, SIMONETT, COYNE, POPOVICH and FALLON KELLY,* JJ., and considered and decided by the court en banc.

PER CURIAM.

These proceedings are before the court on the petition of the Director of the Office of Lawyers Professional Responsibility for disciplinary action against respondent Geoffrey Peters, a lawyer charged with professional misconduct. The matter was referred to the Honorable Paul G. Hoffman, Judge of the District Court, for hearing and for findings and a recommendation of appropriate disposition. The petition alleged and the referee found that respondent, then dean of William Mitchell College of Law, repeatedly engaged in unwelcome physical contact and verbal communication of a sexual nature against four women employees, two of whom were also law students. The referee concluded that respondent's conduct adversely reflects on his fitness to practice law in violation of DR 1–102(A)(6) and recommended a public reprimand. We agree with the referee's conclusion and adopt his recommendation.

The principal thrust of respondent's defense goes to the sufficiency of the evidence. The argument is not particularly directed toward the quantum of the evidence, but rather consists of (1) respondent's continued denial that some of the events took place, (2) his insistence that his conduct was misunderstood by "overly sensitive" individuals, and (3) a concerted attack on the veracity of the employees and one disinterested witness. The credibility argument revolves in large part about the failure of these employees to confront respondent or to complain immediately to some other member of the law school administration. We are of the opinion, however, that the evidence adequately supports the referee's findings that the conduct in fact occurred, that it was reasonably perceived as sexual in nature, and that it was unwelcome and created an hostile and offensive work and education environment.

* Retired justice assigned pursuant to Minn.Stat.

§ 2.724, subd. 3 (1986).

1. Joan Peterson was a Carleton College graduate who worked for a time before entering law school. At the time of the hearing in this matter she was an attorney in the office of a county public defender. She began law school in August 1982 and shortly thereafter was engaged as a research assistant for the respondent and for Associate Dean Melvin Goldberg.

The referee found that on four or five occasions between November 1982 and March 1983, respondent approached Peterson from behind, put his hands around her waist and squeezed it or pulled her sideways into his body. These incidents all occurred in the dean's suite at the college.

Peterson testified that following the first incident, to which she responded by firmly removing respondent's hand and attempting to put some distance between them, she began wearing more business-like clothes—suits and high-collared shirts—instead of the casual attire of many student researchers, because she wanted to make sure that she was not doing anything to encourage this type of behavior.

The referee found that in March 1983, while Peterson was conversing with a professor in the hallway at the college, respondent walked up to Peterson from behind, placed his hand on the back of her head, ran his fingers through her hair and down to her waist, letting his hand come to rest on the small of her back. The professor described the gesture as the kind of familiar contact appropriate between two people who had a close physical relationship. Because the gesture made the professor uncomfortable, as if he were interrupting some sort of intimate contact between Peterson and the respondent, and because Peterson appeared flustered, the professor walked away. A few days later Peterson apologized to the professor for the incident, explaining that she did not want him to get the wrong impression that she had a personal relationship with the dean.

The referee also found that in the spring of 1983 respondent put his hands on Peterson's waist and pulled her into his body and

against a file cabinet in the office of respondent's administrative assistant. Respondent then asked if Peterson was returning to work for him in the fall.

In her testimony, Peterson distinguished between an unobjectionable brief touch on the arm or pat on the shoulder in the course of a discussion on a research project and the offensive and unwelcome touching of her waist and rib cage. Peterson testified that in response to respondent's physical contacts she froze up, ignored the misconduct, and removed respondent's hands if he did not remove them immediately. She attempted to communicate with respondent by notes rather than by speaking to him, and she stayed near the doorway when she entered his office. When asked why she did not report any of these incidents earlier, Peterson responded as follows:

I felt that there would be strong repercussions that could potentially harm, disgrace or end my career. I was just a first-year student * * * and Dean Peters had all the power. * * * I had seen what the administration's reaction was when there were people who went to them with problems and it was generally retaliation for raising any problems, and I didn't want to become part of that. .* * * I just wanted to get another job and get out without—without having to confront him directly and ruin my career.

2. Like Joan Peterson, Nancy Quattlebaum, graduated from Carleton College, then worked the following year for Cargill and for a Florida construction company before entering William Mitchell College of Law. She became a member of the law review and graduated with honors in 1984. She is now an associate in a large metropolitan law firm.

She began working for the respondent as a research assistant in June 1982, after having completed two years of a four-year program. The series of incidents affecting Quattlebaum began early in her employment. Quattlebaum testified that on her first day of work respondent put his arm around her and suggested that she spend the weekend with him at the law school's retreat center to work on a project. She declined the invitation. Respondent admitted extending the invitation but claimed that other senior administrators of the college would have been at the retreat center that weekend.

The referee made no finding with respect to the invitation to the retreat center, but he found that on at least three occasions between June 1982 and May 1983, while working with Quattlebaum in his office, respondent pulled his chair against hers and leaned over into her, sitting so close to her that his knee, leg, and arm were pressed against hers. Respondent did not deny that this occurred and he acknowledged putting his arm around Quattlebaum, but he stated that it was necessitated by the need for them to review documents simultaneously.

The referee found that in December 1982, at the dean's Christmas party, respondent put his arm around Quattlebaum, pulled her to him, and rubbed his hand up and down her rib cage while they were talking to several guests. Respondent does not deny that the incident occurred, but suggests in his brief that Quattlebaum may have been overly sensitive to what was intended as an innocent gesture.

Quattlebaum's response to this course of conduct was to attempt to avoid all situations where respondent could make such advances. In particular, she tried to avoid being alone with respondent in his office by having another research assistant accompany her there. When asked why she did not report these incidents to anyone in an administrative capacity at the college until the following academic year when a faculty member asked whether she had encountered any problems while working for respondent, Quattlebaum made this reply:

Professional suicide. It would have probably ruined my career. Dean Peters was a powerful man with a lot of influential friends. I couldn't take the risk.

3. Laura Shryer was the administrative assistant to one of the associate deans. On approximately six to ten occasions between the spring of 1981 and April 1983, in the

interior corridor of the dean's suite, respondent approached Shryer from behind, placed his hand high up on her rib cage underneath her breast and squeezed her ribs or rib cage, or put his hand on her shoulder and pulled her toward him into his body, or put his hand on the back of her neck, beneath her hair, squeezed her neck and the upper part of her shoulders.

4. Madeleine Wilken was the acting library director of the college. The referee found that in the fall of 1982, while they were getting coffee in the kitchen of the dean's suite, respondent remarked that Wilken did not need a sugar substitute because she had a slim figure and that respondent then squeezed Wilken's waist a few times. Later that fall, during a business conference in the dean's office, respondent commented that he was sure Wilken's "domestic abilities" kept her husband very happy.

The referee also found that in mid-winter on a pre-inspection tour of the library, respondent caressed Wilken's hair and that while they were in a janitorial closet in the basement, respondent put his hands around Wilken's waist, pulled her against his body and squeezed her waist several times.

The referee found that respondent's unwelcome touches and verbal communications substantially interfered with and created an hostile educational environment for two of the women and an hostile employment environment for all four of the women, and he concluded that these repeated physical contacts and verbal communications adversely reflected on respondent's fitness to practice law in violation of DR 1–102(A)(6), MCPR. We note that the referee attached a memorandum to his findings of fact, presumably demonstrating his consideration of various aspects of respondent's defense to the claims while declining to make specific findings with regard to sexual intent or moral turpitude. The memorandum is revealing of the referee's impressions of and reactions to the proceeding as a whole.

Our careful review of the record before us discloses the presence of clear and convincing evidence establishing that the respondent, while serving as dean of William Mitchell College of Law, engaged in repeated unwelcome sexual touchings and verbal communications of a sexual nature against the four employees. Although respondent continues to deny that some of the events took place and to attack the veracity of these employees and the one disinterested witness, the credibility of the witnesses is the province of the finder of fact in disciplinary proceedings as in other legal proceedings, and there is ample testimony —none of it inherently incredible—of the occurrence of each event to support the referee's findings. *In re Simmonds*, 415 N.W.2d 673, 676 (Minn.1987). *See also In re Schmidt*, 402 N.W.2d 544, 545 (Minn. 1987).

As the referee commented, there is no direct evidence establishing, as a fact, that respondent intended his touching to be sexual in nature, but the intention that the touching be an invitation to an intimate relationship is not requisite to sexual harassment. Quid pro quo harassment— that is, forcing an employee to choose between acquiescing to a superior's sexual demands or forfeiting an employment benefit such as promotion, raise, or continued employment—no doubt involves such intent as well as suggesting underlying moral turpitude. On the other hand, the creation of an hostile environment by sexual harassment does not depend on the intent of the perpetrator. An unlawful hostile environment exists when employment is conditioned, either explicitly or implicitly, on adapting to a workplace in which the employee is the target of repeated, unwelcome, sexually derogatory remarks or physical contact of a sexual nature; and the hostility of that environment must be judged from the perspective of the victim. *See Bundy v. Jackson*, 641 F.2d 934, 945 (D.C.Cir.1981).

Although respondent, whose own counsel characterized him as the "tactile dean," contends that one of the witnesses, Ms. Quattlebaum, was overly sensitive, the gravamen of any sexual harassment claim is that the sexual conduct be "unwelcome." 29 C.F.R. § 1604.11(a) (1987); *Meritor Sav.*

*Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986). Whether the employer's conduct should be evaluated by a subjective standard—the effect it had on an individual—or by an objective standard—the effect it would have on a reasonable person—is an issue on which courts are divided.[1] We need not, and do not, decide that issue here because the referee found not only that the four employees interpreted respondent's continual touching as sexual in nature, but that his conduct was unwelcome, and it is apparent from the memorandum attached to his findings that the referee regarded their perception of respondent's conduct as reasonable.[2] The only bystander who testified, a male professor, placed a similar construction on respondent's conduct.

Moreover, sexual harassment is unlawful. Both the federal and Minnesota courts have recognized quid pro quo and hostile environment sexual harassment as actionable forms of sex-based discrimination. In *Continental Can Co., Inc. v. State,* 297 N.W.2d 241, 248–49 (Minn.1980), this court construed the Minnesota Human Rights Act, which prohibits discrimination based on sex with respect to the terms or conditions of employment, as imposing liability for sexual harassment which results in an hostile work environment.

Shortly after our decision in *Continental Can,* the Minnesota legislature amended the Minnesota Human Rights Act to explicitly make hostile environment harassment unlawful. The legislature did so in 1982 by broadening the statutory definition of "discriminate" to include sexual harassment and by adding the following definition of sexual harassment:

Subd. 10a. **Sexual harassment.** "Sexual Harassment" includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature when:

(1) submission to that conduct or communication is made a term or condition, either explicitly or implicitly, of obtaining employment, * * *

(2) submission to or rejection of that conduct or communication by an individual is used as a factor in decisions affecting that individual's employment, * * *

(3) that conduct or communication has the purpose or effect of substantially interfering with an individual's employment, * * * or creating an intimidating, hostile, or offensive employment, * * * environment; and in the case of employment, the employer knows or should know of the existence of the harassment

**1.** The United States Supreme Court seems to suggest application of a subjective standard when it refers to "the victim's employment" and whether the complainant "by her conduct indicated that the alleged sexual advances were unwelcome." *Id.* at 68, 106 S.Ct. at 2406; *Vaughn v. Pool Offshore Co.,* 683 F.2d 922 (5th Cir.1982). *See also* EEOC Guidelines, 29 C.F.R. § 1604.11(a)(3) (1987) (unwelcome sexual conduct which "has the purpose or effect of unreasonably interfering with *an individual's* work performance" (emphasis supplied) constitutes sexual harassment.) On the other hand, the Sixth Circuit has ruled that the trier of fact must judge an hostile environment sexual harassment claim from the perspective of a reasonable person's reaction to a similar environment under like circumstances. *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 620 (6th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).

**2.** Surveys indicate that men and women generally agree in the abstract about what constitutes sexual harassment. *Sexual Harassment in the Federal Government (Part II): Hearings before the Subcomm. on Investigations of the House Comm. on Post Office and Civil Service,* 96th Cong., 2nd Sess. 4–5, 8 (1980); Collins & Blodgett, *Sexual Harassment ... Some See It ... Some Won't,* 59 Harv.Bus.Rev. 77, 81 (Mar.–Apr. 1981). The surveys revealed, however, disparity in perception of the prevalence of sexual harassment. Men, particularly members of upper management, perceived sexual harassment to be much less pervasive than did the women surveyed, a circumstance which suggests some of the difficulty in choosing a standard to be applied by a predominantly male judiciary. Collins & Blodgett, *supra* at 77, 81. Moreover, men who have engaged in this type of conduct, even those who have been exposed through litigation or grievance procedures, usually refuse to admit that their conduct constituted sexual harassment. C. Blackhouse & L. Cohen, *Sexual Harassment on the Job* 2 (1981).

and fails to take timely and appropriate action.

Act of March 23, 1982, ch. 619 § 3, 1982 Minn.Laws 1508, 1511, *codified at* Minn. Stat. § 363.01 (1986).

Recently, a unanimous United States Supreme Court held that sexual harassment which creates an hostile or offensive work environment constitutes a violation of Title VII even if the employee has not lost any tangible economic benefits. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–68, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986). Noting that the imposition of liability for "hostile environment" sexual harassment has its roots in legal theories developed under Title VII to combat racial discrimination, the Court stated:

> Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

*Id.* at 67, 106 S.Ct. at 2406 (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)).

The opening words of Justice Marshall's concurring opinion in *Meritor* are equally appropriate to the present case: "[We] fully agree with the Court's conclusion that workplace sexual harassment is illegal, and violates Title VII." *Id.* 477 U.S. at 74, 106 S.Ct. at 2409.

■ A formal adjudication that conduct is illegal is not prerequisite to a determination that conduct adversely reflects on a lawyer's fitness to practice law. DR 1–102(A)(3) expressly proscribes certain kinds of illegal conduct—illegal conduct involving moral turpitude. DR 1–102(A)(6) prohibits "any other conduct that adversely reflects on [a lawyer's] fitness to practice law." Indeed, this court has held that an attorney may be disciplined for actions which are illegal but do not result in criminal conviction. *In re Ylitalo,* 420 N.W.2d 615, 616

(Minn.1988); *In re Knutson,* 405 N.W.2d 234, 237 (Minn.1987) (attorneys disciplined for failure to file timely tax returns although no adjudication of tax violations); *In re Hanratty,* 277 N.W.2d 373, 376 (Minn.1979) (disciplined for signing an affidavit knowing it to be false). *See also In re Williams,* 414 N.W.2d 394 (Minn.1987), *appeal dismissed sub nom. Williams v. Lawyers Professional Responsibility Bd. of Minnesota,* —— U.S. ——, 108 S.Ct. 1207, 99 L.Ed.2d 409 (1988).

■ Neither can it be said that a lawyer's ethical obligations and professional responsibility are confined to conduct arising out of the attorney-client relationship. The Code of Professional Responsibility has been interpreted as requiring a lawyer to comply with applicable disciplinary rules at all times, regardless whether he or she is acting in a professional capacity. ABA Comm. on Ethics and Professional Responsibility, Formal Op. 336 (1984). We have disbarred lawyers for making fraudulent misrepresentations in business dealings on the ground that "[b]oth clients and non-clients have a right to assume that lawyers will treat them fairly and honestly in all of their dealings, whether professional or otherwise." *In re Raskin,* 307 Minn. 233, 236, 239 N.W.2d 459, 461 (1976); *In re Larson,* 324 N.W.2d 656, 659 (Minn.1982). *See also State v. McNamara,* 68 Wis.2d 701, 229 N.W.2d 698 (1975) (attorney disbarred for fraud in sale of automobiles); *In re Franklin,* 71 N.J. 425, 365 A.2d 1361 (1976) (attorney suspended for submitting false business expense statements to corporation while acting as corporate officer).

A lawyer's professional capacity, moreover, extends well beyond the attorney-client relationship, and it seems to us abundantly clear that a law school dean or law professor acts in the professional capacity of a lawyer in dealing with the law school's students and staff.

■ The ultimate question, of course, is whether respondent's wrongful conduct warrants discipline. While it is true that discipline is seldom imposed for sexual misconduct unless the lawyer has been convict-

ed of a crime or the conduct has arisen within the attorney-client relationship,[3] neither conviction for rape or child abuse nor the presence of an attorney-client relationship are necessary elements to a breach of ethical responsibility by reason of misconduct of a sexual nature.[4] Indeed, in the disciplinary context, "sexual misconduct" covers a multitude of sins. This is not a case of seduction or of explicit demands for sexual favors in exchange for job benefits. It is not an isolated lapse into ill-conceived and indelicate humor. Rather, it is the case of a demonstrated pattern of an employer's lamentable abuse of power grounded on discriminatory sexual harassment.

Moreover, the respondent was not only the employer or supervisor of these employees, he was as well the dean of the law school in which two of the affected individuals were students—a status which made them singularly vulnerable to the dean's abuse of power. Certainly, no one should be required to " 'run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living.' " *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2406 (quoting *Henson* ). But if an employee at least has the less than attractive option of quitting and finding employment elsewhere, a law student who wants to become eligible to practice law is a virtual captive of the law school. The law student can neither leave and go elsewhere to school nor risk retaliation which might take the form of expulsion or failing grades. That fear of retaliation deterred the law students from confrontation with the dean or earlier complaint to other members of the school's ad-

ministrative body seems reasonably apparent from their testimony.

The public nature of much of respondent's conduct does not lessen its oppressiveness. Quite the contrary. Sexual harassment in academic settings is recognized as a pervasive problem,[5] and conduct such as respondent's public embarrassment of Ms. Peterson, which compelled her to apologize to a law professor and assure him that she did not have an intimate relationship with the dean, in combination with the respondent's other conduct, not only was inconsistent with Title VII and the Minnesota Human Rights Act but surely set a pernicious example for the school's students and faculty and reflected adversely on the integrity and honor of the profession. *Cf. In re Bunker,* 294 Minn. 47, 199 N.W.2d 628 (1972) (failure to file income tax returns).

We have on previous occasions sanctioned sexual harassment perpetrated by judges, *In re Miera,* 426 N.W.2d 850 (Minn. 1988); *In re Kirby,* 354 N.W.2d 410, 414 (Minn.1984), as have courts of other jurisdictions. *E.g., In re Seraphim,* 97 Wis.2d 485, 513–14, 294 N.W.2d 485, 500–01, *cert. denied sub nom. Seraphim v. Wisconsin,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980); *In re Kivett,* 309 N.C. 635, 642, 309 S.E.2d 442, 446 (1983). That judges are held to a higher standard of conduct than is expected of lawyers, *In re Winton,* 350 N.W.2d 337, 340 (Minn.1984), does not, however, relieve lawyers of the responsibility to conform to the standard of conduct to which all members of society are subject. We have recently publicly reprimanded a lawyer for a racial slur directed toward another lawyer. *In re Williams, su-*

---

**3.** *See* Comment, *Disciplining Attorneys for Non–Professional Conduct Involving Alcohol and Sex,* 1975 Ariz.St.L.J. 411, 420 (most disciplinary proceedings concerning sexual misconduct arise after a criminal conviction); Annotation, *Sexual Misconduct as Ground for Disciplining Attorney or Judge,* 43 A.L.R. 4th 1062 (1986).

**4.** *In re Miera,* 426 N.W.2d 850 (Minn.1988); *In re Kirby,* 354 N.W.2d 410 (Minn.1984) (judge publicly censured for referring to female attorneys as "lawyerettes" in court); *In re Snyder,* 336 N.W.2d 533 (Minn.1983) (public censure of judge pursuant to stipulation based on adulterous relationship with his secretary); *In re*

*Gould,* 4 A.D.2d 174, 164 N.Y.S.2d 48, *appeal denied,* 4 A.D.2d 833, 166 N.Y.S.2d 301 (1957) (attorney disbarred for soliciting women who came to his office in response to help-wanted advertisements); *Florida Bar v. Hefty,* 213 So.2d 422 (Fla.1968) (attorney disbarred for sexual relations with his step-daughter, a minor).

**5.** B. Dziech & L. Weiner, *The Lecherous Professor: Sexual Harassment on Campus* 13–14 (1984). *See also* Winks, *Legal Implications of Sexual Contact Between Teacher and Student,* 11 J. of L. & Educ. 437, 437–40 (1982).

*pra.* In *Miera,* in addition to the sanctions imposed on the respondent as a judge, we publicly reprimanded him as a lawyer:

> Whether or not his conduct technically constitutes sexual harassment under Minn.Stat. § 363.01, it shows at least indifference to his legal and ethical obligations. Such conduct adversely reflects on his fitness to practice law, and a public reprimand is warranted.

*In re Miera, supra,* at 859. Similarly, the numerous instances of sexual harassment perpetrated by respondent in his capacity as law school dean in the presence of students and faculty signals an indifference to ethical obligations and disregard for the law which reflects adversely on respondent's fitness to practice law in violation of DR 1–102(A)(6), MCPR.

■ While respondent ultimately insists that his conduct was misunderstood, that it was neither sexually motivated nor wrongful, and that, in any event, the conduct did not occur while respondent was acting in a professional capacity because it did not arise out of an attorney-client relationship, these assertions demonstrate respondent's lack of appreciation of his broader responsibilities as an attorney/law school dean and of this court's supervisory function with regard to all aspects of the practice of law. A *public* reprimand is not only an appropriate but necessary response by this court to assure the public and warn the practicing bar that it cannot condone such conduct by an attorney—particularly one of the stature and influence of a law school dean.

Respondent Geoffrey Peters is publicly reprimanded. Respondent shall pay costs in the amount of $500.

POPOVICH and FALLON KELLY, JJ., concur specially.

AMDAHL, C.J., and WAHL and KELLEY, JJ., took no part in the consideration or decision of this case.

POPOVICH, Justice (concurring specially).

1. I concur in the result, but write separately to clarify the limits of this decision.

Professional discipline for noncriminal sexual misconduct outside the attorney-client relationship raises a host of ambiguities. The Lawyers Professional Responsibility Board apparently recognized as much, as it investigated the original complaint and determined discipline was not warranted. The matter was appealed under Rule 8(d) and after a hearing a board panel found probable cause to believe the alleged conduct occurred, but was uncertain whether the acts warranted public discipline and submitted the petition to this court for resolution.

We appointed a referee, whose findings do not entirely dispel the uncertainty about this matter. In addition to the facts recounted by the majority, the referee found (1) Peters was a "tactile dean"; (2) there was no evidence establishing sexual intent or moral turpitude; (3) Peters never touched body areas normally considered sexual; (4) Peters never used language proposing or suggesting sexual contacts; and (5) some of the incidents occurred in social settings in the presence of the parties' friends or acquaintances. The women also conceded that they viewed some of Peters' actions as friendly and supportive, and never remonstrated with him or complained to a corporate officer or director.

We do not, then, face an attorney who made sexual advances to a client or committed a sexual crime, as is typical in attorney discipline cases involving sexual misconduct. *See* Comment, *Disciplining Attorney for Non–Professional Conduct Involving Alcohol and Sex,* 1975 Ariz.St.L.J. 411, 420 (1975); Annotation, *Sexual Misconduct as Ground for Disciplining Attorney or Judge,* 43 A.L.R. 4th 1062 (1986). Instead, the misconduct turns on an interpretation of social interactions in the workplace. The line between acceptable and unacceptable behavior in this area is not sharp, and probably varies with the factual setting and the individuals involved. Questions arise, too, about the connection between these kinds of allegations and an attorney's "fitness to practice law," which should be our only concern in disciplinary proceedings.

2. With these reservations in mind, I agree some discipline is warranted on this record. The referee specifically found Peters created a hostile work environment for all four women, and a hostile educational environment for two of them. He also found that the women's perception of Peters' actions as sexual and objectionable was reasonable. As the majority observes, this conduct constitutes sexual harassment under both Title VII and Minn.Stat. § 363.01, subd. 10A (1986).

Evidence supports this conclusion, though I remain troubled by some of the incidents cited by the referee and the majority. Claims that Peters put his arm around a woman or leaned against her while the two reviewed materials are insubstantial. Not every touch is sexual, and incidents like these are far too ambiguous to form a basis for discipline. Such conduct is commonplace, perhaps inevitable, in working relationships.

Other touches, though, went beyond what anyone would describe as collegial. Without consent, Peters pulled some of the women against his body, held one against a file cabinet, and placed his hands on another "high up on her rib cage underneath her breast and squeezed her ribs." Absent an understanding that such intimacy was mutually acceptable, the women reasonably found Peters' behavior distressing.

The relationship between these parties is also critical. Peters was a law school dean, the women his employees. Two were also students at the school. We recently stressed the abuse of power evident in a judge's advances toward his close personal assistant, finding such conduct "no less troubling when engaged in by an attorney." *In re Miera*, 426 N.W.2d 850, 859 (Minn.1988).

A law school dean stands in a similar position of authority over his student assistants and other school staff. Even if Peters had no sexual intent, he physically imposed himself on persons in a vulnerable position, never attempting to clarify or obtain approval for his actions. He thus placed an onus to object on persons least likely to do so. While I find it lamentable that hugging and touching so often carry sexual connotations, a person in Dean Peters' position is not free to assume his employees consent to intimate physical contact that crosses the boundary of normal workplace interactions. Given the repeated pattern of unwelcome conduct, I agree that in this factual context Peters' behavior adversely reflects on his fitness to practice law.

3. What discipline to impose is, for me, an even more difficult question. Each case must be assessed on its own facts, considering the purposes of an attorney disciplinary proceeding. *In re Kraemer*, 361 N.W.2d 402, 404–05 (Minn.1985). The purpose of a sanction is not to punish the respondent, but to protect the public and deter future misconduct. *Id.; In re Carey*, 380 N.W.2d 806, 809 (Minn.1986). Peters is no longer serving as a law school dean, and he suffered adverse publicity in connection with a previously settled civil suit brought by the women. A public reprimand will serve as additional punishment, and the published opinion will follow Peters for the rest of his life. Particularly since we are carving out new grounds for lawyer discipline, a private reprimand might be a more appropriate sanction in this case.

However, I also recognize the need to set a standard for future deterrence. In fashioning a sanction against Judge Alberto Miera, we clearly announced that we "will not tolerate improper sexual advances by judges." *Miera*, at 859. We must similarly reprove sexual harassment by a law school dean. A public reprimand serves this function without being unduly onerous in these circumstances. To that end, I concur in the majority's disposition of the case.

FALLON KELLY, Justice (Retired) (concurring).

I join in the special concurring opinion of Justice POPOVICH.