In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST David C. WILLIAMS, Attorney at Law:

LAWYER REGULATION SYSTEM OF the STATE OF WISCONSIN, by Ronald R. Smith, Special Investigator, Complainant-Respondent,

v.

David C. WILLIAMS, Respondent-Appellant.

Supreme Court

*No. 02–3327–D. Decided February 23, 2005.*

2005 WI 15

(Also reported in 692 N.W.2d 633.)

¶ 1. PER CURIAM.    Attorney David C. Williams appealed from the revised report of the referee, Eugene A. Gasiorkiewicz, concluding that attorney Williams violated SCR 20:8.4(g)[1] and the attorney's oath, SCR 40.15[2]. Specifically, the referee concluded that publishing four letters in a local newspaper constituted "offensive personality" in violation of the attorney's oath. While we agree with the referee that certain statements

---

[1] SCR 20:8.4(g) provides:    "It is professional misconduct for a lawyer to:    (g) violate the attorney's oath."

[2] SCR 40.15 provides:

The oath or affirmation to be taken to qualify for admission to the practice of law shall be in substantially the following form:

I will support the constitution of the United States and the constitution of the state of Wisconsin;

I will maintain the respect due to courts of justice and judicial officers;

I will not counsel or maintain any suit or proceeding which shall appear to me to be unjust, or any defense, except such as I believe to be honestly debatable under the law of the land;

I will employ, for the purpose of maintaining the causes confided to me, such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law;

---

contained in the four letters were intemperate and inappropriate, we conclude that the statements do not meet the legal standard of "offensive personality" and thus do not constitute a violation of the attorney's oath. Consequently, we dismiss the proceeding.

¶ 2.  Attorney Williams was admitted to practice law in Wisconsin in 1973, practices in Lake Geneva and has not previously been disciplined. Attorney Williams was formerly a member of the District I Office of Lawyer Regulation (OLR) Committee.

¶ 3.  In May, 1999 a committee of the Lake Geneva City Council recommended approval of a proposed transfer of a Class B liquor license from D'Agostino's On The Lake to Su Wings Corporation. The proposed transfer involved D'Agostino's surrendering the liquor license to the city, conditioned on the city issuing the license to Su Wings. In June, 1999 the Lake Geneva City Council denied the transfer of the liquor license to Su Wings. Su Wings then retained Attorney Williams' law firm to represent it relative to the city's denial of the proposed liquor license transfer.

¶ 4.  D'Agostino's did not apply for renewal of the liquor license, so the license lapsed. Under Wisconsin law, a limited number of liquor licenses are available for issuance in each municipality. As a result of the lapse of

I will maintain the confidence and preserve inviolate the secrets of my client and will accept no compensation in connection with my client's business except from my client or with my client's knowledge and approval;

I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged;

I will never reject, from any consideration personal to myself, the cause of the defenseless or oppressed, or delay any person's cause for lucre or malice. So help me God.

the liquor license issued to D'Agostino's, Lake Geneva city officials believed that only one Class B liquor license was available for issuance in the city. In September, 1999, the city awarded a Class B liquor license to an establishment owned and operated by then Lake Geneva Mayor Spyro Condos and his wife.

¶ 5.    On January 7, 2000, Williams filed a claim on behalf of Su Wings with the City of Lake Geneva, pursuant to Wis. Stat. § 893.80, alleging that the city had unlawfully denied the liquor license transfer to Su Wings and had unlawfully issued the liquor license to Mayor Condos. Attorney Williams' claim demanded that Su Wings be awarded the liquor license along with $2 million damages. The text of the claim was published in a front-page article in the January 13, 2000 edition of the *Lake Geneva Regional News,* a local weekly newspaper with a circulation of about 5,500.

¶ 6.    In response to the publication of the claim in the *Regional News* and other publicity about the matter, at a committee meeting held on February 14, 2000, Lake Geneva alderperson Cathleen Ahlgren read a prepared statement in which she disputed certain of the allegations made by Williams in the claim filed with the city. Ahlgren's prepared statement was published in a front-page article in the February 17, 2000 edition of the *Regional News.* The committee meeting at which Ahlgren made the statement was later televised on the public access channel of the local cable television.

¶ 7.    Williams provided the *Regional News* with a copy of a letter addressed to Ahlgren, which was published in the paper's February 24, 2000 edition. Ahlgren did not receive the letter until after it had already been published in the newspaper. In the letter, Williams described Ahlgren as being "confused" and stated Ahl-

gren should visit the city clerk's office to "avoid further embarrassment." The letter said:

> Again, it would be my preference to try legal actions in court where they belong, and where all witness statements must be given under oath. However, we are prepared to try this case in the media if that's what the city prefers. One advantage of doing so is that the city officials make public statements, apparently with no advice from legal counsel. This makes my job much easier.

The letter also contained a list of nine rhetorical questions to Ahlgren.

¶ 8. On March 2, 2000 the *Regional News* published a two-paragraph letter to the editor authored by Lake Geneva Alderperson Richard Peterson. The letter said Peterson did not want to get into a debate with Attorney Williams but offered the suggestions that the letter was too long and that Attorney Williams should direct his "criticism and smart remarks toward the council" rather than the city clerk's office.

¶ 9. On March 9, 2000 the *Regional News* published, in the form of a letter to the editor, a letter addressed to Alderperson Peterson. The letter contained the following statements:

- I will number each paragraph so you don't lose your train of thought.

- It is you and your cronies on the city council who cheated my client of his rights in order to assist one of your own.

- I don't wish to tax your attention span.

- It is not a legal defense for someone to plead that they were "just following orders." Both the actor and one who ordered him/her are liable.

241

¶ 10.   In late March, 2000 the Lake Geneva City Council voted unanimously to deny the claim that had been filed by Attorney Williams on behalf of Su Wings. In late April the *Regional News* published, in a front-page article, the text of a letter from Attorney Williams to the Walworth County District Attorney and the Wisconsin Department of Revenue requesting enforcement action under ch. 125, Wis. Stat., relative to alleged illegal liquor sales by Mayor Condos under the license that Attorney Williams contended had been unlawfully issued to Mayor Condos instead of to Su Wings. In May, 2000 Williams, as counsel for Su Wings, commenced a civil rights action against the City of Lake Geneva, Alderperson Ahlgren and Mayor Condos in Walworth County Circuit Court. The complaint demanded a jury trial on all issues. The defendants removed the case to the United States District Court for the Eastern District of Wisconsin, pursuant to 28 U.S.C. § 1441.

¶ 11.   On June 12, 2000 the Lake Geneva City Council renewed the liquor license that had been issued to Mayor Condos. On June 22, 2000 the *Regional News* published another letter to the editor authored by Attorney Williams. In this letter, referring to an apparent gaffe in videotaping a public meeting and in reference to the city clerk Williams said, "Perhaps the ghost of Rosemary Woods is now roaming city hall at night!" Attorney Williams also called Mayor Condos "Chairman Condos," comparing him to Chairman Mao of China, and said that erecting a statue or posters of Mayor Condos in public parks "might cause Su Wing to freak out and run back to China."

¶ 12.   In early July, 2000 the *Regional News* published a letter from Attorney Williams demanding the city conduct a hearing on a verified complaint which Attorney Williams had filed in his capacity as a city

resident, pursuant to Wis. Stat. § 125.12(2), seeking revocation or suspension of the liquor license issued to Mayor Condos. The city's finance committee held a hearing on the complaint and recommended that the city council reject it. The city council dismissed the complaint in September, 2000. In November Attorney Williams filed a civil action seeking judicial review of the city's decision.

¶ 13.   In January, 2001 the Federal District Court remanded Su Wing's civil action to the Walworth County Circuit Court. On January 31, 2001 the *Regional News* published a letter to the editor authored by Attorney Williams in which he compared Lake Geneva to Chicago, "reputed to be the most corrupt city in the country" and said even in Chicago "Mayor Daley could not violate state statutes and have his cronies award him a liquor license to the detriment of others not so connected without being denounced."

¶ 14.   In June of 2001 the City of Lake Geneva granted a liquor license to Su Wings after it was determined that additional liquor licenses were available due to an increase in the city's population. That same month Attorney Williams' appeal of the dismissal of the Wis. Stat. § 125.12(2) action was dismissed by the Walworth County Circuit Court. The court of appeals subsequently reversed and remanded, concluding that the liquor license issued to Mayor Condos and his wife was void. *See Williams v. City of Lake Geneva,* 2002 WI App 95, 253 Wis. 2d 618, 643 N.W.2d 864.

¶ 15.   In April, 2001 the director of the OLR sent Attorney Williams a letter notifying him that a grievance had been filed against him. Because Attorney Williams was a member of the District I OLR Committee, the investigation proceeded under SCR 22.25, which governs misconduct and malfeasance allegations against Lawyer Regulation System (LRS) participants.

Attorney Williams subsequently resigned from the District I OLR Committee.

¶ 16.   In December, 2002 the LRS filed an order to answer and complaint alleging that various letters written by Attorney Williams and published in the *Regional News* violated SCR 20:3.6.[3] The complaint

---

[3] SCR 20:3.6 provides:

(a) A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

(b) A statement referred to in paragraph (a) ordinarily is likely to have such an effect when it refers to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in deprivation of liberty, and the statement relates to:

(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness;

(2) in a criminal case or proceeding that could result in deprivation of liberty, the possibility of a plea of guilty to the offense or the existence or contents of any confession, admission, or statement given by a defendant or suspect or that person's refusal or failure to make a statement;

(3) the performance or results of any examination or test or the refusal or failure of a person to submit to an examination or test, or the identity or nature of physical evidence expected to be presented;

(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in deprivation of liberty;

(5) information the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and would if disclosed create a substantial risk of prejudicing an impartial trial; or

also alleged that publishing the letters constituted "offensive personality" in violation of the attorney's oath.

(6) the fact that a defendant has been charged with a crime, unless there is included therein a statement explaining that the charge is merely an accusation and that the defendant is presumed innocent until and unless proven guilty.

(c) Notwithstanding paragraphs (a) and (b)(1–5), a lawyer may state all of the following:

(1) the claim; offense or defense involved and, except when prohibited by law, the identity of the persons involved;

(2) the information contained in a public record;

(3) that an investigation of the matter is in progress;

(4) the scheduling or result of any step in litigation;

(5) a request for assistance in obtaining evidence and information necessary thereto;

(6) a warning of danger concerning the behavior of a person involved, when there is reason to believe that there exists the likelihood of substantial harm to an individual or to the public interest; and

(7) in a criminal case, in addition to subparagraphs (1) through (6):

(i) the identity, residence, occupation and family status of the accused;

(ii) if the accused has not been apprehended, information necessary to aid in apprehension of that person;

(iii) the fact, time and place of arrest; and

(iv) the identity of investigating and arresting officers or agencies and the length of the investigation.

(d) Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial likelihood of undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to information that is necessary to mitigate the recent adverse publicity.

245

¶ 17. An evidentiary hearing was conducted in January, 2004. The referee issued a report in April, 2004, which was amended on May 4, 2004. The referee concluded that the letters written by Attorney Williams and published in the *Regional News* did not violate SCR 20:3.6. The referee did conclude, however, that the letters published on February 24, 2000, March 9, 2000, June 22, 2000 and January 31, 2001 violated SCR 20:8.4(g) and the attorney's oath, SCR 40.15. The referee noted that in *State v. Eisenberg*, 48 Wis. 2d 364, 380–81, 180 N.W.2d 529 (1970) this court said:

> License to practice law in this state is granted on implied understanding that an attorney shall at all times demean himself in proper manner and refrain from such practices which bring disrepute upon himself, the profession and the courts. This implied understanding is also affirmed by the Oath taken by the attorney on admission to practice.

¶ 18. The referee also noted that in *State v. Postorino*, 53 Wis. 2d 412, 419, 193 N.W.2d 1 (1972) this court said, "[a] lawyer is a professional man twenty-four hours a day, not eight hours, five days a week." The referee concluded:

> SCR chapter 10 contains a preamble of a lawyer's responsibilities. The initial paragraph of that preamble reads in part as follows: "A lawyer is . . . an officer of the legal system and a public citizen having special responsibility for the quality of justice." The preamble further states that "A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials."

---

(e) A lawyer associated in a firm or government agency with a lawyer subject to paragraph (a) shall not make a statement that is prohibited by paragraph (a).

Regardless of his personal feelings toward Mayor Condos and Cathleen Ahlgren they were "public officials" who did not deserve to be belittled by Respondent. He cannot hide behind his duties to Su Wing to justify his sarcastic and critical tone toward adverse parties in the above-referenced letters.

¶ 19. The referee recommended that Attorney Williams be privately reprimanded.

¶ 20. A referee's findings of fact are to be affirmed unless they are clearly erroneous. *In re Disciplinary Proceedings Against Sosnay,* 209 Wis. 2d 241, 243, 562 N.W.2d 137 (1997). Conclusions of law are reviewed de novo. *In re Disciplinary Proceedings Against Carroll,* 2000 WI 130, ¶ 29, 248 Wis. 2d 662, 636 N.W.2d 718. Although the referee's findings of fact have not been shown to be clearly erroneous and we therefore affirm them, we disagree with the referee's legal conclusion that Attorney Williams violated the offensive personality component of the attorney's oath by virtue of the letters published in the *Regional News.*

¶ 21. This court has previously held that the "offensive personality" component of the attorney's oath may be violated by conduct that occurs out of court as well as by in-court conduct. For example, this court found a violation of the attorney's oath in *In re Disciplinary Proceedings Against Johann,* 216 Wis. 2d 118, 574 N.W.2d 218 (1998). In that case the attorney distributed a printed handout strongly critical of the man who was her child's father and the man's wife. The handout included a picture of the father containing a caption with his name and the term "Accused Serial Rapist." The handout urged a boycott of the law firm where the man's wife practiced and accused her of having cooperated with the man in depriving Attorney

Johann of thousands of dollars in income by their allegedly benefiting from books Attorney Johann asserted she had written.

¶ 22. In *In re Disciplinary Proceedings Against Blask,* 216 Wis. 2d 129, 573 N.W.2d 835 (1998), while serving as Lincoln County District Attorney, Blask engaged in a loud confrontation with a 67–year-old man leaving the register in probate's office, physically placed his hands on the man, attempted to search him, and pushed him backwards with a clenched fist, bending the frames of the eye glasses that were in the man's pocket. Blask also pinned the man's arms to a table, grabbed his jacket collar and released him only when a sheriff's deputy appeared in response to a call for assistance. In a separate incident, following a high school basketball game he attended in Merrill, Blask approached one of the game's referees and expressed significant displeasure with his officiating, then shoved or pushed the referee into a wall. The referee in that case concluded, and this court agreed, that by his physical altercations Blask engaged in offensive personality in violation of the attorney's oath, SCR 40.15 and SCR 20:8.4(g).

¶ 23. In *In re Disciplinary Proceedings Against Ray,* 2002 WI 116, 256 Wis. 2d 19, 651 N.W.2d 727, while representing a father seeking to reestablish joint custody of his children, Attorney Ray began yelling at the sister of her client's former wife about hiding the children while they had been in the state. Attorney Ray threatened the woman that she would go to jail for interference with a child custody order or for conspiracy to kidnap, and she made similar threats against a friend of the sister. On several other occasions Attorney Ray engaged in similarly abusive telephone conversations with the sister and the children's grandmother. Again,

the referee concluded, and this court agreed, that this conduct violated SCR 40.15 and SCR 20:8.4(g).

¶ 24. The conduct at issue in the instant case was not as egregious as the conduct found to have violated the "offensive personality" component of the attorney's oath in *Johann, Blask* or *Ray,* nor did it bring disrepute on Attorney Williams, the legal profession or the courts, as did the conduct in *Eisenberg.* The conduct at issue here consisted entirely of letters written by Attorney Williams and published in the *Lake Geneva Regional News.*[4] We agree with the referee that some of the statements in the letters written by Attorney Williams were acidic, argumentative, arrogant and condescending. While we do not condone either the tone or the content of the letters, we do not find that the letters constituted "offensive personality" in violation of the attorney's oath. In reaching this conclusion we find the referee's finding of fact 87 to carry particular weight:

> Respondent's primary intent in writing the letters complained of in this matter was to protect the personal and business reputation of his client.

Although Attorney Williams perhaps used more oratorical flourish than was prudent, the record supports the referee's finding that his conduct was motivated by the desire to protect his client. Under the circumstances we cannot conclude, as a matter of law, that the letters constituted "offensive personality" in violation of the attorney's oath.

¶ 25. Attorney Williams also argued in his briefs that the referee was incorrect in interpreting the Su-

---

[4] In his brief Attorney Williams raised a First Amendment argument but failed to develop it. We therefore decline to reach the question of whether, or to what extent, the letters at issue might be entitled to First Amendment protection.

preme Court Rules to mean that participants in the LRS do not have the same rights as non-LRS participants to receive a copy of the investigative report and submit a written response thereto. In the alternative Attorney Williams argued that if the referee was correct in this interpretation of the Supreme Court Rules, then the rules violate equal protection under both the Wisconsin and Federal Constitutions. In light of our conclusion that Attorney Williams did not violate any Supreme Court Rules, we decline to reach these issues.

¶ 26.   IT IS ORDERED that the disciplinary proceeding is dismissed without costs.

¶ 27.   PATIENCE D. ROGGENSACK, J., did not participate.