STATE, Plaintiff, v. EISENBERG and another, Defendants.*

*No. State 63.    Argued September 11, 1970.—Decided November 3, 1970.*

(Also reported in 180 N. W. 2d 529.)

* Motion for rehearing denied, with costs, on January 5, 1971.

For the plaintiff there were briefs and oral argument by *Rudolph P. Regez* of Monroe, attorney, and *Warren H. Resh* of Madison, of counsel.

For the defendants there was a brief by *Lawton & Cates* and *Richard L. Cates,* all of Madison, and oral argument by *Alan D. Eisenberg* and *Sydney M. Eisenberg,* both of Milwaukee, and *Richard L. Cates.*

PER CURIAM. The defendants, Sydney M. Eisenberg and his son, Alan David Eisenberg, are engaged in the practice of law as members of the same firm in the city of Milwaukee. The father is fifty-four years of age; the son is twenty-nine. Sidney M. Eisenberg was admitted to practice on June 12, 1939, and Alan Eisenberg on June 6, 1966.

The complaint in this proceeding alleges as follows:

### Count I.

That the defendants, Alan David Eisenberg and Sydney M. Eisenberg, were guilty of conduct which was unprofessional and such as would serve to bring the courts of justice of this state into disrepute and contempt and which was contrary to defendants' duty as licensed attorneys and to the attorney's oath which they took when they were admitted to practice and as set forth at sec. 256.29, Stats., and which oath provides in part as follows:

"I do solemnly swear:

". . .

"I will maintain the respect due to courts of justice and judicial officers . . . ."

That defendants' conduct consisted of the following:

(a) That the defendants, Alan David Eisenberg and Sydney M. Eisenberg, both individually and by concerted action, pursued a course of vindictive and reckless harassment and psychological persecution against the Honor-

able JOHN E. KRUEGER, county judge of Milwaukee county, Wisconsin; that incident to said conduct, they caused to be publicly circulated statements which they knew, or should have known, would reach Judge KRUEGER to the effect that said judge was guilty of conduct for which a criminal warrant could be issued; that he would resign from the bench for personal reasons within sixty to ninety days or such warrant would be issued; and that said statements followed a series of advertisements in which defendants had participated, as alleged at Paragraph (b) hereof; that defendants' conduct was of such aggravated nature as to cause Judge KRUEGER great mental suffering and anguish, which culminated in his death by his own hand on August 28, 1968;

(b) That the defendants participated in causing the following advertisement to be run in *The Milwaukee Journal* and *The Milwaukee Sentinel* from April 20, 1968, through April 26, 1968, and again from April 29, 1968, through May 5, 1968:

"ALL PERSONS with complaints against Judge JOHN E. KRUEGER, write: Citizens' Committee for a more Dignified Traffic Court Judiciary, Greg Maxaculi, 728 Madison av., South Milwaukee, Wis. 53172."

And the following advertisement to be run in *The Milwaukee Sentinel* and *The Milwaukee Journal* from May 14, 1968, through May 27, 1968, and in *The Milwaukee Journal* on June 11, 1968:

"All Complaints against Judge John E. Krueger write: Citizens' Committee, Greg Maxaculi, 728 Madison ave., South Milwaukee, Wis."

(c) That the course of conduct as alleged at Paragraph (a) hereof reached a point that Judge KRUEGER in desperation appealed to a friend for help; that the friend thereupon became an emissary to appeal to defendants that they desist from their activities; that said emissary was told by defendant, Sydney M. Eisenberg

that, "I spent a lot of money getting information on this man. We could chop him up, Ed, and we are going to do it;" that in the negotiations that followed the emissary was told by Sydney M. Eisenberg: "He's [Judge KRUEGER] going to have to agree to what Alan and I decide;" and that in subsequent negotiations between defendants and said emissary a first draft of a press release was dictated by the defendant Sydney M. Eisenberg which became, after certain revisions, the press release as read by Judge KRUEGER.

(d) That in advance of the issuance and reading of the press release, defendant Alan David Eisenberg, did on Sunday night, August 25, 1968, and Monday morning, August 26, 1968, disseminate copies of the press release to several persons and boastfully read the same aloud in public and stated that if Judge KRUEGER did not read it Monday morning, he would be off the bench within sixty to ninety days and suggested to several persons that they be present in Judge KRUEGER'S court to witness the issuance of the press release.

(e) That by the course of the conduct alleged at Paragraphs (a), (b), (c), and (d) Judge JOHN E. KRUEGER was forced by defendants to humiliate himself and the court by issuing the press release on August 26, 1968, and reading the same in open court; that said press release and the ceremony at its issuance were designed to humiliate Judge KRUEGER, to aggrandize defendants Alan David Eisenberg and Sydney M. Eisenberg, and to demonstrate publicly defendants' successful subjugation of Judge KRUEGER.

Defendants filed lengthy answers to the complaint.

As to Count I, the answers allege that the complaint contains conclusions of law that do not require an answer but admit the taking of the attorney's oath prescribed by sec. 256.29, Stats.

With respect to the circulation of statements that Judge KRUEGER was guilty of conduct for which a crim-

inal warrant could be issued, that he would resign within sixty or ninety days or that the warrant would be issued, and that such statements were accompanied with a series of newspaper advertisements soliciting complaints against Judge KRUEGER, the answer alleges that Sydney Eisenberg was not present at the time of the alleged statements but admits on information and belief that Alan Eisenberg did tell a newspaper reporter privately that he wouldn't be surprised if the Judge were off the bench in two or three months for reasons that anybody could see.

The answers further allege that the newspaper advertisements were run by one Gregorio Maxaculi after he had received legal advice from Alan Eisenberg and after approval by *The Milwaukee Journal* editorial board, based on legal advice.

With respect to the press release the answers allege that Attorney Edward Cameron participated in its preparation and that it was read by Judge KRUEGER of his own free will.

Otherwise the answers contain a general denial of the allegations of Count I, Paragraphs (a) to (e), inclusive.

The second defense of defendants' answers alleges that the allegations with reference to harassment of Judge KRUEGER and causing him great mental suffering, culminating in death by his own hand, are irrelevant to the complaint and that the trial of such matters would result in a deprivation of constitutional rights under art. I, secs. 1, 13 and 22 of the Wisconsin Constitution and of the fourteenth amendment to the United States Constitution.

The third defense is that sec. 256.29, Stats., is vague and overbroad so as to violate rights under the first and fourteenth amendments to the United States Constitution.

The fourth defense is that the complaint does not state facts sufficient to constitute a cause of action for discipline.

The fifth defense is that the requirement of sec. 256.29, Stats., for maintenance of respect due to courts of justice and judicial officers violates the right not to be punished by a bill of attainder and *ex post facto* law as provided in art. I, sec. 12, Wisconsin Constitution.

The sixth defense is that the conduct complained of in the complaint is speech activity protected by the first amendment of the United States Constitution.

The seventh defense is that the matters set forth in the complaint were made the subject of an extensive John Doe investigation in Milwaukee county and that the Judge found that no offense had been committed against the laws of Wisconsin, so that to discipline the defendants on the basis of the allegations of the complaint would deny the due process of law and equal protection of the law under state and federal constitutions.

The evidence adduced in a disciplinary proceeding is reviewed de novo in this court to determine if discipline should be imposed.

In *State v. Preston* (1968), 38 Wis. 2d 582, 588c, 157 N. W. 2d 615, 159 N. W. 2d 684, this court stated:

"A disciplinary proceeding is brought as an original action in this court, and the function of the referee is that of a special master appointed to conduct a hearing under the jurisdiction of this court. While the recommendations of the referee are given consideration, we look to the record and transcript to determine whether the facts apparent therein warrant some form of discipline. To evidence revealed in the record, we apply what this court has referred to (*Madison v. Geier* (1965), 27 Wis. 2d 687, 135 N. W. 2d 761) as the middle burden of proof."

The burden of proof is set forth in *State v. Treis* (1944), 245 Wis. 479, 489, 15 N. W. 2d 309, wherein we said:

"While this is a civil action, triable without a jury . . . Proof of the allegations must be by clear and satisfactory evidence, . . ."

The plaintiff relies upon the following facts in support of the complaint:

In May and June of 1968, the defendants caused the following advertisement to be run in *The Milwaukee Journal* and *The Milwaukee Sentinel:*

"ALL PERSONS with complaints against Judge JOHN E. KRUEGER, write: Citizens' Committee for a more Dignified Traffic Court Judiciary, Greg Maxaculi, 728 Madison av., South Milwaukee, Wis. 53172."

Reporter Ronald Haase testified that on August 22, 1968, he had a conversation with Alan Eisenberg in the press room of the Safety Building. They discussed the already well-known enmity between Alan and the Judge, and Alan is alleged to have said:

". . . I predict within sixty to ninety days that Judge Krueger will resign from the bench for personal reasons or a felony warrant will be issued against him."

Alan is also alleged to have said:

"We have got him good, we have got private detectives working on him. . . ."

Haase also testified that he told Judge KRUEGER that same day that Alan made the "felony warrant" statement.

The testimony disclosed that the following day Judge KRUEGER called his friend Edward Cameron to arrange a luncheon date. The Judge confided that he had had sexual relations with a woman attorney. He surmised that this must be what Alan Eisenberg was thinking of when he spoke of the felony warrant.

On Friday, August 23, 1968, Attorney Cameron, acting as an emissary for Judge KRUEGER, visited Sydney Eisenberg at his home in the hope of arranging a settlement of the dispute between the Judge and the Eisenbergs.

On this occasion Cameron testified that shortly after he suggested that the matter was serious and that some-

thing should be resolved, Sydney stated: (1) "I spent a lot of money getting information on this man. We could chop him up, Ed, and we are going to do it;" and (2) "I'll have to talk to Alan, and if he [KRUEGER] will agree to what Alan and I decide, then we will have peace. . . ."

Then Cameron and Sydney Eisenberg agreed to meet in Sydney's office the following morning.

The meeting took place in the Eisenbergs' office, and Sydney again, according to Cameron, said, "Look, Ed, I spent a lot of money. I've got drawers full of information about this guy, he's a bigot. We can ruin him."

On this occasion Cameron stated that he was authorized to speak for Judge KRUEGER and that the Judge wanted the dispute ended. Whereupon, according to Cameron, Sydney replied, "All right, we can resolve it, end it, but he has got to give a press release that Alan and I tell him to give."

Sydney then dictated a press release to a stenographer, speaking in the first person as though he (Sydney) were KRUEGER. As Cameron was about to leave the office, he said to Sydney, "What assurance can I give KRUEGER that the fight is over? Will this (the reading of the release) end it?"

Cameron states that Sydney then said the reading of the release would end the dispute but that:

"I'm [Sydney] not going to destroy the evidence I have gathered against KRUEGER because he could declare war again two weeks after he reads it. . . . The only thing you got to worry about is to get the broad and tell her to keep her mouth shut and everything will be all right. . . ."

Cameron, KRUEGER and Kuzmic, the Judge's bailiff, all met in Cameron's office about 1 p. m., in the afternoon of Sunday, August 25, to discuss the proposed press release. At this conference three changes were made in the press release. Attorney Cameron was substituted for

Miriam Eisenberg on the proposed three-man advisory committee. A passage indicating that Judge KRUEGER would not run for re-election at the end of his present term was deleted, and a reference to the Eisenberg law firm as being "nationally and internationally famous" was deleted.

Later on this same Sunday afternoon, August 25, Cameron and Judge KRUEGER went to Sydney's home to inform him of these changes. The meeting was cordial. There was no objection to the changes, and Cameron and the Judge left the Eisenberg home.

Later that evening, Alan appeared in the Belmont Hotel Coffee Shop and approached a group of people at one of the tables. Included in the group were the late State Senator Norman Sussman and his wife Rose, Mrs. Alice Boettcher, Mr. and Mrs. Ben Siegel; and, according to Mrs. Boettcher, a Mr. Lew Sangor was also present.

According to the testimony of Mrs. Boettcher, Alan arrived at the table carrying copies of the press release on his arm and stated, "I finally did it—I finally made it. I have got him over a barrel." Someone in response asked, "Who?" And Alan replied, "Judge KRUEGER." Alan then handed Senator Sussman a copy of the release and asked him to read it slowly. The Senator refused, so Alan read the release to the group. Senator Sussman expressed doubt that Judge KRUEGER would ever sign such a release. In response to this, by Mrs. Boettcher's account, Alan said that it would make no difference—he would still have him off the bench in sixty days because "he said that they had enough evidence on recalls." Mrs. Boettcher also testified that Alan made a statement that next he would get Judge MOSER.

According to Newspaper Reporter William Hale, about 10 a. m., Monday morning, after Judge KRUEGER's bailiff had summoned reporters from the press room, the Judge read the press release in his chambers. Shortly prior to this time, Alan was standing in the hall in front of Judge

KRUEGER'S court handing out copies of the release. William Hale also testified that Attorney Orville Pitts told him that as he (Pitts) was walking down the hall, Alan came up to him and said (referring to the impending reading of the release) :

" '. . . Come on, Orville, . . . I want you to watch Judge KRUEGER make an ass out of himself.' . . ."

The making of this statement was corroborated by Attorney Pitts.

Later Judge KRUEGER read the release in chambers and then from the bench.

*Sentinel* Reporter William Janz that same day visited Judge KRUEGER and asked the Judge why he appointed the Eisenbergs to the committee. Judge KRUEGER first replied that he could not talk about it, but, when pressed for an answer, Judge KRUEGER broke down and began to cry. He stated, according to Janz, that the Eisenbergs had evidence against him and that Alan had been pressuring and harassing him. Later that day Janz suggested that they go directly to *The Milwaukee Sentinel* offices and discuss the matter with his editor. They then proceeded to the office of Harvey Schwandner, editor of the *Sentinel.*

At this meeting the Judge confided to Mr. Schwandner that he had had sexual relations with a woman attorney and that he (KRUEGER) believed that the Eisenbergs knew about it. Schwandner assured the Judge that for the time being the *Sentinel* would print nothing about the affair.

On Tuesday, August 27, 1968, the morning *Sentinel* carried a story which stated Judge KRUEGER told the newspaper that the Eisenbergs had pressured and harassed him into giving the press release of the previous day, which release created the court advisory committee.

Joseph Pecor, a *Milwaukee Sentinel* reporter, testified that in a telephone conversation with Alan, the following

statement was made by Alan, "I have something on him. Someday over a few beers I'll tell you how I got him to do this."

William Jennaro, an assistant district attorney, testified that immediately before the press release was read by Judge KRUEGER, Alan said to him, "Listen to this, I've got him."

Attorney Orville Pitts testified that on August 26, 1968, the day Judge KRUEGER read the press release, that Alan Eisenberg saw him in the Safety Building and said, "Come on, Orville, I want you to go somewhere with me," to which he replied, "Where?" and Alan said, "I'm going to Judge KRUEGER. I want you to see something. I want you to watch Judge KRUEGER make an ass out of himself."

The defendants' version of the factual situation is in sharp conflict with that of the state.

In regard to the conversation between Alan and Reporter Haase in the Safety Building on Thursday, August 22, 1968, Alan denies that he said a felony warrant would soon be issued against Judge KRUEGER. He also denies that he said that he had private detectives working on the Judge. What he told Haase, he says, is that a sitting judge could only be removed under three circumstances: recall, impeachment or being found guilty of a crime and resultant disbarment.

At the meeting on Sunday, August 25, 1968, at the Eisenberg home, Alan states that he said to Judge KRUEGER, "If you want to make changes or reforms in your court, why don't you just go ahead and do it? What do we need a press release or a committee for?"

Alan admits he showed the release to Senator Sussman because he was proud of the accomplishment it represented. He denies that he made the other remarks attributed to him by Mrs. Boettcher.

The next incident was the reading of the press release on Monday, August 26, 1968. Here Alan admits that he

invited Attorney Pitts to see the ceremony in Judge KRUEGER'S court. Again he did so because he was proud of the reforms. Alan denies that he said to Pitts, "Come on and watch KRUEGER make an ass out of himself."

A defense witness, June Fell, a former Eisenberg secretary, testified that she was in Sydney's office when Sydney and Cameron discussed the release problem and that it was her impression that the press release was Cameron's idea, but that Sydney and Cameron composed it jointly and that Alan did not participate in the conference.

During these proceedings Alan Eisenberg gave testimony which directly conflicts with the testimony of 13 witnesses. The record shows that as to any testimony which supported the allegations of the complaint, Alan refutes the same by labeling it to be false.

Portions of some of the testimony of state witnesses were corroborated by other witnesses.

The defense tried to show that Attorney Cameron, the state's principal witness, was a person of questionable character and involved in criminal activities. To this end they produced a witness, one Clarence Harris, a former client of Cameron's and an oft-convicted burglar who at the time of the hearing was an inmate at the state prison.

The state, in response to Clarence Harris' testimony, called his brother, Lawrence Harris, who testified that Clarence's reputation for truth and veracity was very poor and that, in his opinion, Clarence was not above perjuring himself.

The defense produced additional testimony by like characters disparaging Attorney Cameron's general reputation.

This entire interlude in the hearing could be discarded if it were not for the fact that the referee concluded that on the basis of this testimony he had serious doubts about Cameron's truthfulness.

The state tried to rehabilitate Cameron's reputation by calling prominent Milwaukee judges and lawyers to testify that he enjoyed a good reputation for honesty. The referee excluded this testimony, and the state claims this was error.

We think the Harris testimony about Cameron should not have been allowed because it did not go directly to his reputation for the particular character traits supposedly being impeached, *i.e.,* integrity and veracity. This testimony went instead to Cameron's general character.

Speaking on the topic of impeaching credibility, McCormick says:

". . . Surely it is clear that in this elusive realm of opinion as to reputation as to character it is best to reach for the highest degree of relevancy that is attainable. Fortunately the great majority of our courts have taken this view and limit the inquiry to 'reputation for truth and veracity.' Only a few open the door, in addition, to reputation for 'general character' or 'general moral character' and fewer still permit proof of reputation for specific traits other than veracity." McCormick, *Evidence* (hornbook series) (1954), p. 95, sec. 44. *See also:* 3 Wigmore, *Evidence* (3d ed.), p. 450, sec. 923.

However, once the error occurred and the testimony was let in, there can be no question but that Cameron's general character, and, by implication, his reputation for truth and veracity, had become an issue. Under these circumstances, the state was entitled to enter contrary evidence both as to his general character and as to the specific traits of truthfulness and veracity. *State v. Baker* (1962), 16 Wis. 2d 364, 114 N. W. 2d 426; 4 Jones, *Evidence, Civil and Criminal* (5th ed.), p. 1629, sec. 867; 98 C. J. S., *Witnesses,* p. 464, sec. 532.

In weighing the evidence we must consider the interest which the defendants had in the outcome of this case against the interest of those who testified in behalf of the plaintiff.

It is a well-established legal principle:

". . . The test of interest is to be applied to all witnesses, and, while the circumstances may vary, the test remains the same, and where witnesses of apparently equal credibility disagree, circumstances tending to indicate which version of the transaction is reliable will be carefully considered." 98 C. J. S., *Witnesses,* pp. 475, 476, sec. 538.

The referee found that Alan Eisenberg made the statements attributed to him by Mrs. Boettcher and Mrs. Sussman.

After a careful review of the record and transcript made in these proceedings, we find:

(1) That Alan Eisenberg publicly charged Judge KRUEGER with conduct (unspecified) for which a criminal warrant could issue;

(2) That Alan Eisenberg predicted the Judge would resign for "personal reasons" within a short period rather than face prosecution;

(3) That Alan Eisenberg arranged for, and Sydney signed checks in payment of, newspaper advertisements soliciting complaints against Judge KRUEGER;

(4) That in concert the defendants pressured the Judge unwillingly to appoint them to an advisory committee concerning the administration of his court;

(5) That in concert the defendants forced the Judge to publicly read a press release announcing their appointment for the purpose of aggrandizing themselves and demonstrating their subjugation of and their dominance over the Judge; and

(6) We find that the above acts of the defendants constitute unprofessional conduct tending to bring the courts into disrepute and contempt and that such conduct is contrary to the duties of the defendants as licensed attorneys and in violation of their oaths as attorneys, taken pursuant to sec. 256.29, Stats.

The second defense of defendants' answers alleged in substance that the effects of the alleged conduct are irrelevant and that the trial of such matters would result in a deprivation of constitutional rights.

We agree that the allegations of the complaint with reference to great mental suffering of Judge KRUEGER, culminating in death by his own hand, are irrelevant. In this proceeding we are primarily concerned with the conduct of the defendants.

It is the duty of the defendants to maintain toward all courts a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its dignity.

The defendants' third defense—that sec. 256.29, Stats., is vague and overbroad so as to violate rights under the first and fourteenth amendments to the United States Constitution—is without merit and cannot be sustained.

This court in *In re Cannon* (1932), 206 Wis. 374, 240 N. W. 441, placed an interpretation on sec. 256.29, Stats., which limited its potential scope and application in a manner clearly consistent with the mandates of the United States Constitution.

The fourth defense is in effect a demurrer to the sufficiency of the complaint.

On December 4, 1968, this court entered an order overruling the demurrer with prejudice. We think that ruling was and is proper since the complaint does not stop with charging the making of statements. It charges a course of conduct which is alleged to be unprofessional.

The fifth defense alleging that the requirement of sec. 256.29, Stats., for maintenance of respect due to courts of justice and judicial officers violates the right not to be punished by a bill of attainder and *ex post facto* law as provided in art. I, sec. 12, Wisconsin Constitution, is in our opinion without merit.

License to practice law in this state is granted on implied understanding that an attorney shall at all times

demean himself in proper manner and refrain from such practices which bring disrepute upon himself, the profession and the courts. This implied understanding is also affirmed by the oath taken by the attorney on admission to practice.

The sixth defense alleging that the conduct complained of in the complaint is speech activity protected by the first amendment of the United States Constitution is repetitious of the fourth defense and is also without merit.

Although speech activity is involved, it is intermingled with a course of conduct which is alleged to be unprofessional. The fact that speech is intermingled with conduct does not endow the conduct with constitutional protection where the state can properly regulate the conduct as a whole. *Cameron v. Johnson* (1968), 390 U. S. 611, 617, 88 Sup. Ct. 1335, 20 L. Ed. 2d 182.

The solicitation of complaints against a judge by newspaper advertisements is in itself a weapon of awesome intimidation, especially where, as here, the defendants clearly intended to use the results to intimidate the Judge. The defendants did not request any advertisements that replies be referred to the proper authorities. On the contrary, the record indicates the defendants were obtaining and keeping any information acquired for their own use against the Judge.

Canon 1 of the Canons of Professional Ethics of the American Bar Association, which canons were adopted in Rule 9 of the Rules for the Integration of the Bar by the Wisconsin Supreme Court, 273 Wis. xx (1956), provides in part:

"Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities. . . ."

We think the solicitation of complaints through newspaper advertisement constituted, under the circumstances,

a part of a program of intimidation of a judge and thus went beyond the attorney's right of free speech.

The defendants' last defense contends that the matters set forth in the complaint were made the subject of an extensive John Doe investigation and that the judge found that no offense had been committed against the laws of Wisconsin, so that to discipline the defendants would deny defendants due process of law under state and federal constitutions.

We find no merit to this contention. The purpose of a John Doe proceeding, pursuant to sec. 954.025, Stats., is to ascertain whether a crime has been committed and by whom committed; while a disciplinary proceeding is a civil action under sec. 256.28 (12).

We conclude that the evidence clearly and satisfactorily establishes that both defendants are guilty of irresponsible and unprofessional conduct. The conclusion warrants suspension of the defendants' licenses.

Therefore, it is ordered and adjudged that the license of defendant Sydney M. Eisenberg be and is hereby suspended until reinstatement; defendant may apply for reinstatement of his license after the expiration of one year and upon compliance with sec. 6, Rule 10, State Bar Rules. One half of the costs of these proceedings, which costs aggregate $20,559.79, shall be taxed and charged to the defendant, payable within twelve months.

It is further ordered and adjudged that the license of defendant Alan David Eisenberg be and is hereby suspended until reinstatement; defendant may apply for reinstatement of his license after the expiration of one year and upon compliance with sec. 6, Rule 10, State Bar Rules. One half of the costs of these proceedings, which costs aggregate $20,559.79, shall be taxed and charged to the defendant, payable within twelve months.

It is further ordered that the State Bar of Wisconsin notify the courts of record of these orders by sending each copies thereof.

It is further ordered that Sydney M. Eisenberg and Alan David Eisenberg notify their respective clients now represented by them in all matters involving the practice of law or all matters pending in any court of this state that their respective licenses to practice law in this state are now suspended.

* Motion for rehearing denied, with costs, on January 5, 1971.