In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
Alan D. EISENBERG, Attorney at Law:

OFFICE OF LAWYER REGULATION f/k/a Board of
Attorneys Professional Responsibility,
Complainant-Respondent,

v.

Alan D. EISENBERG, Respondent-Appellant.

Supreme Court

No. 2002AP386–D. Submitted on briefs April 25, 2006.
—Decided January 19, 2007.

2007 WI 7

(Also reported in 726 N.W.2d 634.)

For the respondent-appellant there were briefs by *Richard J. Cayo, Christopher T. Kolb,* and *Halling & Cayo, S.C.,* Milwaukee.

For the complainant-respondent there was a brief by *Robert G. Krohn* and *Roethe Krohn Pope LLP,* Edgerton.

¶ 1. PER CURIAM. We review the recommendation of the referee, Richard M. Esenberg, that Alan D. Eisenberg's petition seeking the reinstatement of his license to practice law in Wisconsin be denied. Although the referee found that Attorney Eisenberg's conduct during the term of his suspension has been exemplary, that he has fully complied with the terms of the suspension order, and that he has maintained compe-

tence and learning in the law during the suspension, the referee nevertheless recommended against granting the petition for reinstatement because he concluded Attorney Eisenberg has not proven by clear, satisfactory, and convincing evidence that he has a proper understanding of and attitude toward the standards that are imposed upon the members of the bar and that he will act in conformity with them, nor has he proven that he can be safely recommended to the legal profession, the courts, and the public as a person fit to be consulted by others and to represent them and otherwise act in matters of trust and confidence, and in general to aid in the administration of justice as a member of the bar and as an officer of the courts. The referee also concluded that Attorney Eisenberg has not proven by clear, satisfactory, and convincing evidence that his resumption of the practice of law will not be detrimental to the administration of justice and will not be subversive of the public interest.

¶ 2. Attorney Eisenberg filed a response to the referee's report and recommendation, pursuant to SCR 22.32(2),[1] requesting that this court not adopt the recommendation of the referee and instead grant the petition for reinstatement. This court issued an order indicating it would benefit from additional briefing on the question of whether Attorney Eisenberg has satisfied the requirements for reinstatement. After consideration of those briefs, along with the referee's report and the entire record, we conclude that Attorney Eisenberg's petition for reinstatement should be granted. We also direct that the costs of the reinstate-

---

[1] SCR 22.32(2) states that "[w]ithin 10 days after the filing of the referee's report, the petitioner and the director may file in the supreme court a response to the report."

ment proceeding, which total $9089.18 as of May 25, 2006, be paid by Attorney Eisenberg.

¶ 3. Attorney Eisenberg's license to practice law in this state was suspended for a period of one year, effective April 6, 2004, for engaging in eight counts of misconduct committed in five separate matters. *See In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, 269 Wis. 2d 43, 675 N.W.2d 747. The misconduct included failing to take steps to protect a client's interests upon termination of representation; failure to disclose all relevant information to the Office of Lawyer Regulation (OLR); engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation; knowingly making a false statement of fact to a tribunal; engaging in conduct intended to disrupt a tribunal; violating the attorney's oath; entering into a business transaction with a client; using means which have no substantial purpose other than to embarrass, delay, or burden a third person in the course of representing a client; and knowingly making a false statement of material fact or law to a third person. Attorney Eisenberg had been disciplined for professional misconduct on three previous occasions. Two of those proceedings resulted in a suspension of his license to practice law. The third resulted in a public reprimand.

¶ 4. Attorney Eisenberg filed a petition for reinstatement of his license on January 11, 2005. A public hearing was held on the reinstatement petition on July 25, 2005. Several witnesses testified in opposition to reinstatement of Attorney Eisenberg's license, citing his lack of civility and inability to take seriously the professional obligations of an attorney.

¶ 5. Attorney Eisenberg testified in support of his petition for reinstatement. He explained that since the suspension he had attended continuing legal education

(CLE) programs totaling 109 credits, 33½ of which were for attendance at professional ethics courses. He said he had been heavily involved in the real estate profession, which involved negotiating and bringing people together, and he had been an active participant in the Greater Milwaukee Association of Realtors Ethics Grievance Arbitration Committee. In addition, Attorney Eisenberg testified that he had served as the executive secretary of the Wisconsin Umpires Association, was a co-founder and executive director of the North Shore Historical Society, was a contributing editor of a Latino newspaper, and was active in work on behalf of various humane animal societies. He also said he had been elected to the board of directors of an organization called Citizens for Responsible Government, which analyzes political developments and seeks accountability from public officials.

¶ 6. Multiple witnesses also testified in support of Attorney Eisenberg's petition for reinstatement. Attorney Eisenberg's witnesses described him as forceful, aggressive, tough, and bright and said they were convinced he is remorseful about the conduct that led to his most recent suspension and if he is reinstated he will be a very good attorney again.

¶ 7. The referee issued his report and recommendation on September 8, 2005. The referee noted that in assessing whether an attorney has demonstrated by clear, satisfactory, and convincing evidence that he has met the requirements for reinstatement, there is no presumption of rehabilitation upon the expiration of a specified term of suspension with no evidence of intervening or subsequent misconduct present. *See In re Disciplinary Proceedings Against Hyndman,* 2002 WI 6, ¶ 4, 249 Wis. 2d 650, 638 N.W.2d 293.

¶ 8. The referee noted that Attorney Eisenberg has certainly demonstrated that he has maintained learning in the law and he has maintained a record of varied community service during the period of his suspension. The referee also noted that witnesses who testified on Attorney Eisenberg's behalf reflected that at least some of his legal clients were highly appreciative of his services and would welcome the opportunity to retain him in the future. The referee also said there was no evidence of dishonest conduct during the period of suspension. However, the referee was troubled by Attorney Eisenberg's past conduct and how that past conduct might predict his future behavior. The referee's comments in this regard include:

> I recognize that there is often a connection between overzealous advocacy and misrepresentation and, therefore, concerns about Mr. Eisenberg's ability to restrain himself are not unrelated to the potential for misrepresentation as his disciplinary history reveals. Mr. Eisenberg has more often been found guilty of misrepresentation in the course of advocacy as opposed to efforts at personal gain.

> The principal question then, regarding reinstatement, seems to be Mr. Eisenberg's facility to take overly aggressive positions in advocating his own interests and, at times, those of his clients. Each of his prior suspensions involved such conduct . . . .

> Zeal in an attorney is a virtue but only to a point. Both effective advocacy and compliance with the duties lawyers owe to the courts, the public and to participants in the judicial process require the ability to discern when an argument is frivolous and when the admittedly faint bounds of civility have been transgressed.

Put another way, lawyers need an internal voice that tells them when to stop. Mr. Eisenberg has often failed to hear that voice.

. . . .

. . . [T]he question here is not whether Mr. Eisenberg has heard that cautionary voice in the past (clearly, too often, he has not) but whether he will hear it in the future.

¶ 9. The referee found it troubling that Attorney Eisenberg did not unambiguously apologize for the conduct that led to his most recent suspension. While the referee acknowledged that in and of itself, the mere failure to apologize might not be strong evidence against reinstatement, the referee said, "[t]he nagging sense that Mr. Eisenberg still doesn't get it is strengthened by his attitude toward the Referee's findings in the case leading to suspension." The referee noted when asked about the findings made by the referee in the suspension matter, Attorney Eisenberg asserted that this court had said that the referee's report was "biased," that the court "somewhat agreed" that three of the counts may not have been proven, and he repeatedly said the court had somehow modified the referee's credibility findings which were "devastatingly critical" of Attorney Eisenberg.

¶ 10. The referee in the reinstatement proceeding noted that this court did no such thing and although the court did say that, on one of the counts, a trier of fact could have gone either way, it affirmed each of the referee's findings of fact as not clearly erroneous. The reinstatement referee noted that when pressed, Attorney Eisenberg said that this court must have disagreed with the suspension proceeding referee to some extent because it did not adopt that referee's recommendation of revocation. The reinstatement referee noted that this

court expressly said that the misconduct that was proven, along with Mr. Eisenberg's past disciplinary history, would certainly warrant revocation but the court declined to impose that sanction because, given Mr. Eisenberg's age, revocation might effectively prohibit him from ever practicing law again. The reinstatement referee said somehow Attorney Eisenberg apparently interpreted an act of mercy as at least a partial vindication, and he said this was troubling.

¶ 11. The reinstatement referee also noted that Attorney Eisenberg repeatedly made comments suggesting or expressly claiming that he has been singled out and treated in ways no other lawyer would be. In the referee's opinion, all of these concerns raised doubts as to whether Attorney Eisenberg understands the standards to which he must conform.

¶ 12. The referee recommended that Attorney Eisenberg's petition for reinstatement be denied, that he be directed to turn over the balance of his trust account to the state Unclaimed Property Fund, and that he be ordered to pay the costs of the reinstatement proceeding. The referee said that in the event this court should reinstate Attorney Eisenberg's license, the reinstatement should be conditioned on his reimbursing the Wisconsin Lawyers' Fund for Client Protection in the amount of $11,500.[2]

¶ 13. As noted above, following receipt of the referee's report and the responses thereto filed by Attorney Eisenberg and the OLR, this court requested the parties to file additional briefs addressing the question whether Attorney Eisenberg has satisfied the requirements for reinstatement. After careful consider-

---

[2] The record indicates that Attorney Eisenberg subsequently paid the Wisconsin Lawyers' Fund for Client Protection $11,500 under protest.

ation of those additional briefs in conjunction with the referee's report and the entire record, we conclude that Attorney Eisenberg's petition for reinstatement should be granted.

¶ 14. SCR 22.31(1)[3] provides the standard to be met for reinstatement. Specifically, the petitioner must show by clear, satisfactory, and convincing evidence that he or she has the moral character to practice law, that his or her resumption of the practice of law will not be detrimental to the administration of justice or subversive of the public interest, and that he or she has complied with SCR 22.26 and the terms of the order of suspension. In addition to these requirements, SCR 22.29(4)[4] states related requirements that a petition for reinstatement must show. All of these additional requirements are effectively incorporated into SCR 22.31(1).

---

[3] SCR 22.31(1) provides: Reinstatement hearing.

(1) The petitioner has the burden of demonstrating, by clear, satisfactory, and convincing evidence, all of the following:

(a) That he or she has the moral character to practice law in Wisconsin.

(b) That his or her resumption of the practice of law will not be detrimental to the administration of justice or subversive of the public interest.

(c) That his or her representations in the petition, including the representations required by SCR 22.29(4)(a) to (m) and 22.29(5), are substantiated.

(d) That he or she has complied fully with the terms of the order of suspension or revocation and with the requirements of SCR 22.26.

[4] SCR 22.29(4) provides: Petition for reinstatement.

(4) The petition for reinstatement shall show all of the following:

¶ 15. We will adopt a referee's findings of fact unless they are clearly erroneous. Conclusions of law are reviewed de novo. *See In re Disciplinary Proceed-*

(a) The petitioner desires to have the petitioner's license reinstated.

(b) The petitioner has not practiced law during the period of suspension or revocation.

(c) The petitioner has complied fully with the terms of the order of suspension or revocation and will continue to comply with them until the petitioner's license is reinstated.

(d) The petitioner has maintained competence and learning in the law by attendance at identified educational activities.

(e) The petitioner's conduct since the suspension or revocation has been exemplary and above reproach.

(f) The petitioner has a proper understanding of and attitude toward the standards that are imposed upon members of the bar and will act in conformity with the standards.

(g) The petitioner can safely be recommended to the legal profession, the courts and the public as a person fit to be consulted by others and to represent them and otherwise act in matters of trust and confidence and in general to aid in the administration of justice as a member of the bar and as an officer of the courts.

(h) The petitioner has fully complied with the requirements set forth in SCR 22.26.

(j) The petitioner's proposed use of the license if reinstated.

(k) A full description of all of the petitioner's business activities during the period of suspension or revocation.

(4m) The petitioner has made restitution to or settled all claims of persons injured or harmed by petitioner's misconduct, including reimbursement to the Wisconsin lawyers' fund for client protection for all payments made from that fund, or, if not, the petitioner's explanation of the failure or inability to do so.

587

*ings Against Carroll,* 2001 WI 130, ¶ 29, 248 Wis. 2d 662, 636 N.W.2d 718. We note that the referee's conclusions that Attorney Eisenberg has failed to prove by clear, satisfactory, and convincing evidence that he has a proper understanding of and attitude toward the standards that are imposed upon the members of the bar and that he will act in conformity with them; that he has failed to prove that he can be safely recommended to the legal profession, the courts, and the public as a person fit to be consulted by others and to represent them; and that he has also failed to prove that his resumption of the practice of law will not be detrimental to the administration of justice and will not be subversive of the public interest are denominated as findings of fact. We deem these statements to be conclusions of law and we will review them as such.

¶ 16. We determine that the referee's remaining factual findings are not clearly erroneous and we adopt them.

¶ 17. As previously noted, prior to the 2004 suspension Attorney Eisenberg had been disciplined for professional misconduct on three previous occasions. The dissent outlines the facts of those earlier cases in some detail and expresses the concern that Attorney Eisenberg's disciplinary history "provides plenty of evidence to garner skepticism about his remorse." Dissent, ¶ 48.

¶ 18. We share the dissent's concern about Attorney Eisenberg's disciplinary history, as did the reinstatement referee. The number of prior disciplinary proceedings in which Attorney Eisenberg has been involved, as well as the serious and unsavory nature of some of the specific counts of misconduct that he was found to have committed, do not paint a pretty picture.

However, Attorney Eisenberg's disciplinary history was taken into account when this court imposed a one year license suspension for the most recent misconduct in 2004. We note, and the dissent concedes, that Attorney Eisenberg's history of disciplinary problems does not directly affect his petition for reinstatement of his license to practice law. Rather, the focus must be on whether Attorney Eisenberg has satisfied the burden imposed on him by SCR 22.31(4) and SCR 22.29(4). We conclude that he has done so.

¶ 19. The dissent says, "it is [Attorney Eisenberg's] own words during his reinstatement hearing that establish that he falls well short of satisfying his SCR 22.31(1) reinstatement burden." Dissent, ¶ 48. As an example the dissent points to testimony presented at the reinstatement hearing regarding an incident that occurred with Attorney Michele Ford in September 2003. Attorney Ford testified that in a telephone conversation she had with Attorney Eisenberg while she was working in her capacity as City Attorney for the City of St. Francis, after she refused to accept a deal demanded by Attorney Eisenberg, he hurled a profane insult at her and slammed down the phone. Attorney Eisenberg did not admit to using profanity but did concede he made an inappropriate remark.

¶ 20. In explaining the incident at the reinstatement hearing Attorney Eisenberg said he became upset with Ms. Ford because he was representing an elderly woman who had no funds; that he handled the matter on a pro bono basis; and that he was attempting to talk Ms. Ford into dropping the $40 award of costs that Ms. Ford proposed as a means of disposing of the case because his client could not afford to pay $40. Attorney Eisenberg said he asked that his client be allowed to

perform community service in lieu of paying the $40 and Ms. Ford said she would not agree to that because it was contrary to standard policy. Attorney Eisenberg testified:

> So I started out by saying, we've got a stipulation here. First of all, is there a problem with it, and second, this lady has no money. She's got terrible problems. She's an older woman. It wasn't her fault. I'd like to just explain it to you. And then she started getting on my case. . . .
>
> And I thought she did raise her voice to me, and the more she got upset, the more I got upset. . . .
>
> And I wish that I hadn't got upset, and I'm sorry that I did.

¶ 21. The dissent also points out that Attorney Eisenberg called Attorney Ford the week before the reinstatement hearing and she said she viewed his comments to her as being intimidating. Dissent, ¶ 54. When asked about the phone call he placed to Attorney Ford, Attorney Eisenberg said, "I wanted to try to find out what this was about" and he denied any intent to intimidate or threaten her. We note that the reinstatement referee drew no conclusion regarding Attorney Ford's perception that Attorney Eisenberg's comments were an attempt to intimidate her. The referee said while Attorney Ford's perception was certainly plausible, Attorney Eisenberg's denial of any improper intent was equally plausible.

¶ 22. The dissent also points to testimony from the reinstatement hearing in which Attorney Eisenberg said he feels he must be very circumspect in his professional behavior because the OLR had a different set of rules for him as compared to other attorneys. We note that in further explaining this statement Attorney

Eisenberg said, "Well, it sure has felt that way, but I'm not criticizing them. I think that [the OLR] does [its] job."

¶ 23. The excerpts from the transcript of the reinstatement hearing highlighted by the dissent reveal that Attorney Eisenberg was, in some of his remarks, cantankerous and grouchy. However, those excerpts constitute a small percentage of the 135 pages of testimony provided by Attorney Eisenberg. A reading of the entire transcript indicates that, at least at times, the atmosphere at the hearing was highly charged and the OLR's counsel and Attorney Eisenberg had a number of spirited exchanges in which both made somewhat querulous remarks. Although we agree that Attorney Eisenberg should have been more circumspect in some of his comments, at the end of the day, when asked by his attorney whether he was resolved to observe the admonitions this court has issued in its orders and refrain from conduct that the court finds offensive, Attorney Eisenberg responded, "With all my heart and soul. . . . With every ounce of intellect that I can muster up."

¶ 24. While some of Attorney Eisenberg's past conduct has been far less than exemplary—indeed, at times it has been deeply flawed—he has already been disciplined for that bad conduct. The pertinent inquiries before us are what was the state of his conduct during the term of his suspension, i.e., since April 2004; whether he currently has a proper understanding of and attitude toward the standards that are imposed upon members of the bar and whether he will act in conformity with them; and whether he can be safely recommended to the legal profession, the courts and the public. After a careful review of the entire record, we conclude that the answer to this question is "yes."

■■■■■■■■■■■■■■■■

¶ 25. The referee specifically found, and we agree, that Attorney Eisenberg's conduct during the suspension has been exemplary and above reproach. We also note the referee's specific findings that since his suspension, Attorney Eisenberg has maintained competence in learning in the law by attendance at numerous educational activities. Although the referee was concerned that Attorney Eisenberg has not expressed much in the way of contrition, nor has he undergone counseling, neither our order suspending his license nor the rules governing reinstatement require counseling, and the record reveals that Attorney Eisenberg has expressed remorse for his past conduct.

¶ 26. After our de novo review of the referee's conclusions of law, including the above-referenced statements which were denominated findings of fact, we conclude that Attorney Eisenberg has met his burden imposed by SCR 22.31(1) of demonstrating by clear, satisfactory, and convincing evidence that his resumption of the practice of law would not be detrimental to the administration of justice or subversive of the public interest. Accordingly, we grant Attorney Eisenberg's petition for reinstatement. We also direct that Attorney Eisenberg be assessed the costs of this reinstatement proceeding.

¶ 27. When we suspended Attorney Eisenberg's license, we rejected the referee's recommendation for revocation, saying:

> Given Attorney Eisenberg's age, revocation might effectively prohibit him ever practicing law again. Age is not necessarily a mitigating factor. *See In re Disciplinary Proceedings Against Fennig,* 227 Wis. 2d 379, 595 N.W.2d 710 (1999) (60–day suspension imposed for 70+year-old attorney rather than public reprimand). But under these circumstances we hope that a shorter

period of forfeiture will suffice to deter other attorneys from engaging in similar misconduct and motivate Attorney Eisenberg, if he ever returns to the practice of law, to conduct himself in an ethical manner, without exception. . . .

*Eisenberg,* 269 Wis. 2d 43, ¶ 34.

¶ 28. In granting Attorney Eisenberg's petition for reinstatement, we stress that he is not being held to a different or higher standard of conduct than other attorneys in this state. All attorneys licensed to practice in Wisconsin are held to the highest standard of conduct, and we expect nothing less from Attorney Eisenberg. We also stress that we expect the exemplary behavior which Attorney Eisenberg has exhibited during the period of his suspension to continue once he resumes the practice of law.

¶ 29. IT IS ORDERED that Alan D. Eisenberg's license to practice law in Wisconsin is reinstated effective the date of this order.

¶ 30. IT IS FURTHER ORDERED that within 60 days of the date of this order Alan D. Eisenberg shall pay to the Office of Lawyer Regulation the costs of this proceeding. If the costs are not paid within the time specified, and absent a showing to this court of his inability to pay the costs within that time, the license of Alan D. Eisenberg to practice law in Wisconsin shall be suspended until further order of the court.

¶ 31. JON P. WILCOX, J. (*dissenting*). The court has concluded that Attorney Alan D. Eisenberg has satisfied his burden and should be reinstated to practice law in Wisconsin. Based on his behavior during his suspension, I conclude he has fallen well short of the

burden imposed by SCR 22.31(1). He should not be reinstated at this time. Accordingly, I respectfully dissent.

## I. BACKGROUND

¶ 32. Before addressing the specifics that support my conclusion that Attorney Eisenberg should not be reinstated, background related to his history of disciplinary problems provides a helpful context.

¶ 33. Four years after being admitted to practice law in Wisconsin, Attorney Eisenberg first had his law license suspended in 1970. *State v. Eisenberg,* 48 Wis. 2d 364, 180 N.W.2d 529 (1970). He "pursued a course of vindictive and reckless harassment and psychological persecution against the Honorable John E. Krueger, county judge of Milwaukee county, Wisconsin." *Id.* at 367–68. Attorney Eisenberg hired a private investigator to investigate Judge Krueger. The court made the following findings:

> (1) That Alan Eisenberg publicly charged Judge Krueger with conduct (unspecified) for which a criminal warrant could issue; (2) That Alan Eisenberg predicted the Judge would resign for "personal reasons" within a short period rather than face prosecution; (3) That Alan Eisenberg arranged for and Sydney signed checks in payment of newspaper advertisements soliciting complaints against Judge Krueger; (4) That in concert the defendants pressured the Judge unwillingly to appoint them to an advisory committee concerning the administration of his court; (5) That in concert the defendants forced the Judge to publicly read a press release announcing their appointment for the purpose of aggrandizing themselves and demonstrating their subjugation of and their dominance over the Judge; and (6) We find that the above acts of the defendants

594

> constitute unprofessional conduct tending to bring the courts into disrepute and contempt and that such conduct is contrary to the duties of the defendants as licensed attorneys and in violation of their oaths as attorneys, taken pursuant to sec. 256.29, Stats.

*Id.* at 379. Attorney Eisenberg's "conduct was of such aggravated nature as to cause Judge Krueger great mental suffering and anguish, which culminated in his death by his own hand on August 28, 1968." *Id.* at 368.

¶ 34. The pattern of Attorney Eisenberg refusing to accept responsibility began during his first disciplinary proceeding. "During the[] proceedings Alan Eisenberg gave testimony which directly conflict[ed] with the testimony of 13 witnesses. The record show[ed] that as to any testimony which supported the allegations of the complaint, Alan refute[d] the same by labeling it to be false." *Id.* at 377.

¶ 35. Attorney Eisenberg had his law license suspended for the second time in 1988. *In re Disciplinary Proceeding Against Eisenberg,* 144 Wis. 2d 284, 423 N.W.2d 867 (1988). The court suspended Attorney Eisenberg for two years for conduct stemming out of two cases. In the first case, Attorney Eisenberg was suspended for:

> having made statements to the press prior to a criminal trial which concerned the character, credibility and reputation of the accused, whom he represented, and his opinion of the evidence, the merits of the case and the innocence of his client; having entered into a contract regarding the publication rights to the story of his representation of that criminal defendant; having participated in the preparation and filing of a civil complaint purported to have been prepared and filed by an individual pro se in connection with a pending extradition proceeding against his client; having failed to disclose relevant facts concerning the latter conduct

in response to inquiries from the Board of Attorneys Professional Responsibility in its investigation; and having made offensive, undignified and discourteous remarks to a prosecutor concerning a witness and in closing argument to a jury concerning a prosecutor.

*Id.* at 287. In the second case, Attorney Eisenberg "knowingly made a false statement intended for publication that the Attorney General had written him that counsel for an adverse party in pending litigation was chargeable with false swearing and perjury." *Id.*

¶ 36. In suspending Attorney Eisenberg, the court lamented that

[b]y that misconduct Attorney Eisenberg has established a pattern of attempting to influence litigation by means prohibited by the rules governing the conduct of attorneys, including misrepresentations to the court and, through the press, to the public. Such abuse of our court system warrants severe discipline. Moreover, as this is not the first occasion we have had to discipline him, Attorney Eisenberg has shown that severe discipline is needed to impress upon him the obligation to comport himself in accord with the ethical standards of the profession.

*Id.* at 287–88.

¶ 37. Attorney Eisenberg was publicly reprimanded in 1996. He failed to arrange for winding up his practice within 15 days of the effective date of his 1988 suspension, in violation of SCR 22.26(3). In this case, Attorney Eisenberg had until August 1, 1988, to terminate his practice. The Board's investigation showed that the balance in Attorney Eisenberg's trust account on August 31, 1988, was $39,011.75. The account was not closed, and approximately two dozen checks were written on the account after that date. The last check

cleared the bank in May of 1989, leaving a balance of $34,771.65.

¶ 38. The Board concluded that Attorney Eisenberg failed to act with diligence in returning client funds to clients at the close of their cases. Attorney Eisenberg, as a partner in a law firm, also failed to make reasonable efforts to ensure that the firm had in effect measures giving reasonable assurance that all lawyers in the firm conformed to the rules of professional conduct. Finally, Attorney Eisenberg failed to close out his trust account, a necessary step in winding up his practice upon suspension of his license to practice law.

¶ 39. Attorney Eisenberg's third suspension, and final to date, occurred in 2004. *In re Disciplinary Proceedings Against Eisenberg,* 2004 WI 14, 269 Wis. 2d 43, 675 N.W.2d 747. The court suspended Attorney Eisenberg's license for one year. The court concluded he engaged in nine counts of misconduct.

¶ 40. Two counts involved a client who elected to have one of Attorney Eisenberg's associates continue representing her after the associate left Attorney Eisenberg's firm. Based on testimony, the referee found that Attorney Eisenberg had his staff fabricate billing statements, which he incorporated into his affidavit. Additionally, the referee found that Attorney Eisenberg failed to surrender the unearned retainer and the client's file in a timely manner.

¶ 41. Two counts involved Attorney Eisenberg submitting an affidavit in support of a California application to appear pro hac vice. In the affidavit, he indicated that he had never been suspended from legal practice. In fact, he had been suspended on two previous occasions.

¶ 42. Two counts arose from Attorney Eisenberg acting inappropriately at a Department of Transportation hearing. He took over the hearing, refused to follow procedural rules, and left with his client before the hearing was over. The following excerpt from the transcript of the hearing captures some of his inappropriate behavior:

Eisenberg: I'm going to conduct an examination of my client.

Examiner: You will ask the questions after I ask the questions.

Eisenberg: No, I will make a statement.

Examiner: You will, I will give you—

Eisenberg: I, I, I'm not interested in your procedures or your rules. I'm going to make a statement of explanation. I'm going to ask him a question, and then you can ask him whatever you want.

Examiner: I can let you make a statement, but I will ask him the questions first.

Eisenberg: I will ask him the questions first.

Examiner: Mr. Eisenberg, this is, this is the way we do our hearings (inaudible)—

Eisenberg: This is the way I do your hearings.

The hearing continued with a similar tone, until Eisenberg and his client left before it was over.

¶ 43. Another count involved Attorney Eisenberg entering into a business transaction with a client with whom he had developed an attorney/client relationship when assisting the client with a building code violation.

The client entered into a listing contract to sell a property through the Alan Eisenberg Real Estate Company. Attorney Eisenberg failed to advise the client of the conflict of interest, the client was not given an opportunity to seek independent advice, and the client did not waive the conflict in writing.

¶ 44. The final two counts arose from a call Attorney Eisenberg placed to the Corvallis, Oregon police dispatch. He told the dispatcher that he had a "life or death emergency" in demanding to speak with an off-duty detective. During the phone call, he also used vulgar language. The following excerpt from the transcript of the call captures some of his inappropriate behavior:

Eisenberg: It's a life or death emergency; if I don't get a call from him, you tell him I'm going to have his badge.

Dispatcher: Can I tell him what it's about?

Eisenberg: You got—It's a life or death emergency.

Dispatcher: Can I tell him what the emergency is?

Eisenberg: I said what

Dispatcher: It may speed up . . .

Eisenberg: You get the asshole on the phone, you have him call me now.

The purpose of Attorney Eisenberg's call was to determine why the detective had left a business card at the residence of Attorney Eisenberg's client.

¶ 45. In suspending Attorney Eisenberg for one year, the court "hope[d] that a shorter period of forfeiture [would] suffice to deter other attorneys from

599

engaging in similar misconduct and motivate Attorney Eisenberg, if he ever return[ed] to the practice of law, to conduct himself in an ethical manner, without exception." *Eisenberg,* 269 Wis. 2d 43, ¶ 34.

## II. EISENBERG'S FAILURE TO SATISFY HIS SCR 22.31(1) BURDEN

¶ 46. SCR 22.31(1) imposes a burden on an attorney seeking reinstatement. Among other things, the attorney must demonstrate by clear, satisfactory, and convincing evidence "[t]hat his or her resumption of the practice of law will not be detrimental to the administration of justice or subversive of the public interest." SCR 22.31(1)(b). Part of satisfying the SCR 22.31(1)(b) burden includes satisfying the requirements under SCR 22.29(4). Majority op., ¶ 14.

¶ 47. In concluding that Attorney Eisenberg had satisfied his burden, the court focused on where it departed from agreement with the referee's rationale for his recommendation. Mainly, it indicates that the referee made his decision based on Attorney Eisenberg neither going to counseling nor having a satisfactory level of contrition related to incidents leading to his latest suspension. The court pointed out that the rules governing reinstatement require neither and that "the record reveals that Attorney Eisenberg has expressed remorse for his past conduct." Majority op., ¶ 25.

¶ 48. Attorney Eisenberg's history alone provides plenty of evidence to garner skepticism about his remorse. Nevertheless, his history of disciplinary problems does not directly affect his petition for reinstatement. Rather, it is his own words during his reinstatement hearing that establish that he falls well short of satisfying his SCR 22.31(1) reinstatement

burden. Some may dismiss Attorney Eisenberg's testimony as including some "cantankerous and grouchy" remarks, majority op., ¶ 23, but even a small selection of his testimony found in the record leads to the conclusion that he should not be reinstated at this time.

¶ 49. First, Attorney Eisenberg's testimony at the hearing illustrates he lacks "a proper understanding of and attitude toward the standards that are imposed upon members of the bar and will act in conformity with the standards." SCR 22.29(4)(f). A review of his testimony leaves me concluding that his understanding of the rules is distorted and his attitude toward them is hostile. Stated another way, he has an improper understanding of, and attitude toward, the rules.

¶ 50. Attorney Eisenberg's attorney selected an incident that occurred with Attorney Michele Ford for Attorney Eisenberg to express his proper understanding and attitude.[1] Attorney Ford appeared at Attorney Eisenberg's reinstatement hearing to oppose his reinstatement. She testified in regard to a phone conversation that she had with Attorney Eisenberg when she was working in her capacity as City Attorney for the City of St. Francis. According to Attorney Ford, after she refused to accept a deal demanded by Attorney

---

[1] Attorney Eisenberg's testimony relating to the incident with Attorney Ford highlights his improper understanding of, and attitude toward, the rules. Although the incident itself raises unique concerns, my focus is on his testimony. The majority opinion, in reacting to this discussion of the testimony, focuses elsewhere. Specifically, the majority notes that Attorney Eisenberg was representing a poor elderly woman on a pro bono basis. Majority op., ¶ 20. I respect Attorney Eisenberg's pro bono work, but that does not change the fact that his testimony highlights his improper understanding of, and attitude toward, the rules.

Eisenberg he said, "I'm going to rip you a new asshole" and slammed down the phone. Attorney Eisenberg disputed whether he used the term "asshole," but conceded that he said he was "going to rip her a new one."

¶ 51. In asking about the incident Attorney Eisenberg's attorney said:

> We're obligated, Mr. Eisenberg, to show in connection with our petition that you're mindful of the rules that are—that bind lawyers and are resolved to conform your conduct to them. And with respect to this phone call with Michele Ford—I'd like to have you tell the Referee what you can about the effect of the suspension on your attitude towards those kinds of interchanges and the likelihood that they're going to recur.

Attorney Eisenberg began his response by saying the following: "Well, the effect of the suspension to me felt like an atom smasher on a tsetse fly, and I'm the tsetse fly." He concluded his response with,

> I will tell you that I've had discussions with [my attorney], who's told me that if in confession with my priest, I look at the priest and I say, You're an asshole, I stand a good chance of drawing a Bar complaint because there's probably a new set of rules for me.

Attorney Eisenberg chose to say he has a unique set of rules applied to him, rather than discussing his understanding and appreciation of the rules of professional conduct.

¶ 52. Maybe if this were an isolated comment I could be convinced that Attorney Eisenberg was merely making an exaggerated comment for effect. Yet, this was not an isolated comment. Attorney Eisenberg repeatedly forwarded his distorted view that a different set of rules applied to his conduct. When the Office of

Lawyer Regulation (OLR) attorney cross-examined Attorney Eisenberg, the following exchange occurred:

> OLR: Mr. Eisenberg, you mentioned in your testimony that you feel you have to be very circumspect in terms of your professional behavior because there's a, quote, "new set of rules for you," end of quote—
>
> Eisenberg: Right.
>
> OLR: —do you remember that testimony?
>
> Eisenberg: It's accurate, too.
>
> OLR: In a sense you're telling this Referee and us and everyone here that there's a different set of professional code rules for Alan Eisenberg as compared to all other attorneys?
>
> Eisenberg: There sure is.
>
> OLR: There is?
>
> Eisenberg: Yes, there is. Yes. It's called State of Wisconsin Office of Lawyer Regulation versus Alan Eisenberg. Those are the rules. That's the law of the land. That's the case that dictates what I must do, how I must behave. That's the rule of me.

With such a distorted view of the rules of conduct, I cannot agree with the court that Attorney Eisenberg has satisfied his burden of proving that he "has a proper understanding of and attitude toward the standards that are imposed upon members of the bar and will act in conformity with the standards." SCR 22.29(4)(f).[2]

---

[2] The majority opinion points out that Attorney Eisenberg went on to explain the different set of rules that apply to him,

¶ 53. Attorney Eisenberg's failure to exhibit a proper understanding of, and attitude toward, the rules of professional conduct alone should be enough for this court to not reinstate him. Nevertheless, his behavior leading up to his reinstatement hearing raises questions about whether his conduct has been "exemplary and above reproach," SCR 22.29(4)(e), and he can "safely be recommended to the legal profession, the courts and the public as a person fit to be consulted by others and to represent them," SCR 22.29(4)(g).

¶ 54. Attorney Eisenberg's conduct leading up to the hearing was described as intimidating. The week before Attorney Ford appeared at the reinstatement hearing in opposition to Attorney Eisenberg's reinstatement, Attorney Eisenberg called her. According to Attorney Ford, Attorney Eisenberg said, "You know, I'm good friends with your law firm." Attorney Ford stated that "during the course of [the] conversation, I started to feel, you know, I got the distinct impression that there was an attempt to intimidate me."

¶ 55. The intimidating phone conversation with Attorney Ford alone may not be enough for this court to not reinstate his license, but it indicates concern about his conduct during his suspension. At the very least, it

stating, " 'Well, it sure has felt that way, but I'm not criticizing them. I think that [the OLR] does [its] job.' " Majority op., ¶ 22. In the remainder of his response to the OLR attorney he said the following: "In your case when I said to be perfectly honest, you made a sarcastic comment to me; in essence, calling me a liar before I testified. So that isn't something that I would ever be able to get away with, but you can. I could never get away with it." I draw no conclusion related to the sincerity of Attorney Eisenberg's compliment of the OLR. However, in context, Attorney Eisenberg's isolated compliment of the OLR does not offset his otherwise improper understanding of the rules of conduct.

makes me hesitate to join an opinion that declares that Attorney Eisenberg's conduct has been "exemplary and above reproach."

¶ 56. Related to safely recommending Attorney Eisenberg to the legal profession, courts and clients, his testimony at his reinstatement hearing indicates he is ill-equipped to return to his practice. Specifically, he testified that during his suspension he "attempted to stay involved in constructive things that would keep him out of trouble . . . in activities that would not be adversarial." He focused on real estate, which he described as "negotiating and bringing people together. It doesn't involve getting people off of anything or advocating for the defense of people or anything like that or plaintiffs or civil cases or anything. It's just the opposite. So that's one of the things that I spent a great deal of time." He also said the following about his latest suspension: "it's brought me to the realization that when people do things to stress me out, I can't handle [them] the way [I did] when I was younger. I'm much more stressed out now about these kinds of things than I was when I was a younger man."

¶ 57. For a person that has such a disastrous history with disciplinary problems, this is more than a little troubling. When he was a "younger man" he got suspended only four years after being admitted to practice law for behavior that is nothing short of offensive. The offensive behavior he exhibited as a "younger man" has remained a hallmark of his practice of law for almost 40 years. A district attorney, in explaining why he had made the effort to oppose Attorney Eisenberg's reinstatement, said, "it's his lack of civility. It is his abrasive approach."

¶ 58. If he has avoided all adversarial situations during his suspension, and gets more stressed out now

605

than when he was younger, it seems difficult to conclude that Attorney Eisenberg has satisfied his burden of proving that he "can safely be recommended to the legal profession, the courts and the public as a person fit to be consulted by others and to represent them and otherwise act in matters of trust and confidence and in general to aid in the administration of justice as a member of the bar and as an officer of the courts." SCR 22.29(4)(g).

## III. CONCLUSION

¶ 59. Based on Attorney Eisenberg's own words at his reinstatement hearing, he failed to satisfy his SCR 22.31(1) burden. First, he has an improper understanding of the rules that apply to attorneys. Second, he failed to exhibit exemplary conduct during his suspension. Finally, he cannot be safely recommended to the profession, the courts, or clients. Accordingly, he should not be reinstated at this time. I respectfully dissent.

¶ 60. I am authorized to state that Justices N. PATRICK CROOKS and PATIENCE DRAKE ROGGENSACK join this dissent.